·No. 3358.—THE STATE OF LOUISIANA ex rel. SALOMON & SIMPSON *v.* JAMES GRAHAM, Auditor of the State of Louisiana.

The·proceedings instituted against the Auditor of the State to compel him to warrant in favor of J. O. Nixon, under the act of the General Assembly passed March 1, 1871, No. 32, entitled "An Act for the relief of J. O. Nixon, late Public Printer," is a suit, and the State of Louisiana has the right to intervene to prevent her agent from being compelled to do an act which she avers is unauthorized by law. The State has, therefore, such an interest in the success of the defendant as will authorize her to intervene in the suit. 22 An 366. ·

The Legislature has no power by the terms and conditions of an act of the General Assembly to conclude the State itself from inquiring judicially into the validity and constitutionality of the act. In such a case the doctrine of estoppel has no application. In determining the amount of the debt of the State within the meaning of the third amendment to the constitution, it was held that all bonds authorized to be issued by the General Assembly on condition that something was to be done by the grantee as a condition precedent to their issue formed a part of the debt and must be estimated. It was held further that bonds of the State, which had been issued to the banks, although amply secured by mortgage, could not on that account be excluded from the estimate.

The State having employed J. O. Nixon as Public Printer, and having made full and complete settlement for all claims and demands, it was held that the act awarding him a certain amount thereafter passed on first of March, 1871, to make up a deficiency which he claimed to have sustained by being compelled to negotiate the warrants at a discount, created a new debt against the State. It was further held that it being shown by evidence offered in this case, that the State debt at the time of the passage of this act was in excess of twenty-five millions, the constitutional limit to which the debt could be allowed to go, and that therefore the act No. 32, of March 1, 1871, appropriating to J. O. Nixon fifty thousand dollars for the purposes set forth in the preamble of the act is unconstitutional, null and void.

APPEAL from the Eighth District Court, parish of Orleans. *Dibble,* J. *Labatt & Aroni,* for relators, appellants. *Semmes & Mott, Hayes & New,* and *Hornor & Benedict,* for defendants and appellees.

LUDELING, C. J.   The relators pray for a writ of mandamus to compel the State Auditor to issue a warrant to them for fifty thousand three hundred and thirty-one dollars and forty-six cents. They sue as the assignees of the right of James O. Nixon, under an act of the General Assembly of the State of Louisiana, passed on the first of March, 1871, and numbered thirty two.

The Auditor alledged, as cause for refusing to issue the warrant, that the act No. 32 of the General Assembly of the State of Louisiana is unconstitutional.

And the State of Louisiana, represented by the Attorney General, intervened in the suit, and denied the right of J. O. Nixon to a warrant, on the ground that the act No. 32. is unconstitutional, inasmuch as at the date of its passage the debt of the State exceeded twenty-five millions of dollars, and the General Assembly was prohibited by the third amendment to the constitution of the State, promulgated in December, 1870, to *increase* the debt of the State after it had reached that sum.

To this intervention the relators excepted, on the following grounds, to-wit:

*First*—That this is not such a case as authorizes the intervention of the State to prevent the issuance of the warrant demanded under act. No. 32 of the Legislature of 1871.

*Second*—That the State is estopped by the terms of the act itself from appearing herein for the purposes set forth in the petition of intervention, and in law is estopped from disputing the validity of its acts duly passed according to law, and binding upon all officers of the government.

*Third*—That the intervention discloses no cause of action.

I. An intervention is a demand by which a third person requires to be permitted to become a party *to a suit* between other persons, either by joining the plaintiff in claiming the same thing, or something connected with it, or by *uniting with the defendant in resisting the claim of the plaintiff*. C. P. 337. In order to be entitled to intervene, it is enough to have an interest in the success of either of the parties to the suit. C. P. 389.

Is the proceeding instituted by the relators against the Auditor *a suit?* We think it is. Has the State an interest in the success of either of the parties to a suit? Unquestionably she has. We can perceive no reason why the State should be denied the right to intervene to prevent her agent from being compelled to do an act which she avers is unauthorized by law. 22 An. 366, State, ex rel. Burbank, etc., *v.* Dubuclet, State Treasurer.

II. If the doctrine contended for by the relators be correct, the amendment of the constitution fixing the limit of the State debt would practically be without effect, whenever the Legislature inadvertently or designedly disregarded its provisions. The doctrine of estoppel is utterly inapplicable to a case like this.

III. The State is interested in enforcing the provisions of the constitution, and in resisting the claims of the relators.

The judge *a quo* correctly overruled the exception, and permitted the intervention. It is unnecessary, therefore, to decide whether the Auditor had any discretion relative to issuing the warrant in question.

On the merits, the question presented, is the constitutionality or unconstitutionality of the act of General Assembly passed March 1, 1871, and numbered thirty-two.

The solution of this question depends upon two facts: Did the debt of the State of Louisiana exceed twenty-five millions of dollars at the date of the act of the Legislature aforesaid, and did the said act *create* a debt?

The evidence in the record leaves no doubt that the debt of the State exceeded twenty-five millions of dollars on or before the first of March, 1871.

State ex rel. Salomon & Simpson v. James Graham, Auditor.

The total amount of bonds of the State, issued at that
    date, was---------------------------------------------$22,560,233 00
The total amount of debts other than bonds on Decem-
    ber 31, 1870, was------------------------------------- 2,461,501 40

            Total debt on December 31, 1870--------------$25,021,734 40

Between the thirty-first of December, 1870, and the first
    of March, 1871, the increase of warrants and cer-
    tificates, was------------------------------------------ $ 552,174 14

But if we concede, what is not true, that the uncollected back taxes
would absorb the warrants and certificates of indebtedness, still there
is no room to doubt that the *debt* of the State largely exceeded the
limitation of the constitution on the first day of March, 1871.

The remaining bonds of the State, in favor of the Missis-
    sippi and Mexican Gulf Ship Canal Company, to be
    issued under act No. 116 of the General Assembly
    of 1869, amount to----------------------------------    $126,000 00
The remaining bonds of the State, in favor of the North
    Louisiana and Texas Railroad Company, to be issued
    under act No. 108, of the General Assembly of 1868,
    is not less than-------------------------------------    594,000 00
The bonds of the State, in favor of the New Orleans,
    Mobile and Chattanooga Railroad Company, to be
    issued under the seventh section of act No. 31 of
    the General Assembly of 1870, equal----------------    3,000,000 00

        Total amount of bonds to be issued------------    $3,720,000 00

        Total amount of bonds issued------------------    22,560,000 00

        Total amount of bonded debt------------------    $26,280,000 00

Besides this, the State has obligated itself to indorse the bonds of
the New Orleans, Mobile and Chattanooga Railroad Company, and the
New Orleans, Baton Rouge and Vicksburg Railroad Company to the
extent of $12,500 per mile of each of said railroads, as they are com-
pleted.   It is contended that the bonds issued in favor of the property
banks, amounting to $4,839,933 33, should not be computed as *debts* of
the State, because they are amply secured by the assets of the banks,
and because the accrued interests thereon have been promptly paid by
the banks.   It is well known, especially in this country, that persons,
natural and artificial, frequently fail in business; and from affluence
they are suddenly reduced to insolvency.   The present ability of the
property banks to meet their liabilities is no guaranty that the State
will not eventually have to pay her bonds, issued to aid said banks;
and much less is it a reason to say that the said State bonds should not .

be computed as a part of the debt of the State. If it had been intended to exclude these bonds or others in the computation of the debt of the State, limited by the constitution, it would have been done in express terms.

In the case of the city of Baltimore v. Gill, 31 Md., the court held that a temporary loan to the city, made on a pledge of railroad stock owned by the city, was *a debt*, notwithstanding it was stipulated in the contract that the city was exempted from all personal liability, and that the lender should look alone to the pledge for payment. In that case the city of Baltimore had attempted to evade a constitutional provision, by which the debt of the city could not be increased, except on the joint assent of the Legislature and of the people by a vote.

It is also insisted by counsel that "the indebtedness of the State can only be ascertained from the amount of the outstanding liabilities, for the payment of which, part of the principal and the annual interest, the authorities must provide and raise a revenue; but obligations or promises to issue hereafter bonds to railroads, when they are built and which, perhaps, never will be built, do not constitute an indebtedness, because the State need not provide to pay a part of the principal and the interest on the bonds which do not exist. And if the State is ever called on to issue such bonds they will be amply secured by mortgages, which will be at least an equivalent, and consequently an asset to counterbalance the liability."

The fallacy of counsel consists in assuming, first, that a conditional obligation is no obligation; and second, that the promissory note of A secured by a mortgage on the property of B, is not a debt of the maker, A, because it is secured. Both positions are untenable

"Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition, etc. C. C., article 2021.

The condition being complied with has a retrospective effect to the day that the engagement was contracted; if the creditor dies before the accomplishment of the condition, his rights devolve on his heirs." C. C., article 2041. "And the creditor may, before the fulfillment of the condition, perform all acts conservatory of his rights." C. C., article 2042.

Thus the obligations of the State, in relation to the railroad companies aforesaid are suspensive and potestative conditional obligations; the State is a debtor to those companies, and the fulfillment of the conditions will have a retrospective effect to the time when the engagements were contracted. For example, when the Mississippi and Mexican Gulf Ship Canal Company will have completed the construction of the lock on said canal, the company will be entitled to demand the bonds of the State for $126,000, and when issued, it will not be

denied, the bonds will form a part of the debt of the State. But when and how was the debt created? It is clear it was created by the act of the Legislature in 1869. The law on this subject is the same in the other States of this Union.. "A party bound by either an express or an implied contract, in virtue whereof he may become liable to the payment of money, is a debtor, although his liability be contingent." 5 Barb. 410; 18 Wend. 375, 386;.5 Cowen 67; 8 Cowen 427; and 4 Greenl., 195.

The reasoning of Chief Justice Mellen seems conclusive.

"The objection is that Van Wyck was not a creditor of Seward at the date of the deed, because it was then uncertain whether he would ever have a cause of action on the covenant. Let us see where this doctrine would carry us. If one promise to pay money at a future day, he may pay before the credit expires, and until that time arrives, it is uncertain whether an action will ever accrue on the promise. The contract of surety only creates a contingent liability. Until the principal is in default, it is uncertain whether an action will ever accrue against the surety. The drawer of a bill of exchange is only bound to pay it upon a contingency, which may never happen; and so it is with the indorser of negotiable paper of all kinds. The contract of indemnity is another case where an action may never accrue upon the undertaking. In these, and all other cases depending upon contract, the person with whom the engagement is made is as much a creditor, within the meaning of the statute, as though he had a debt on which a right of action already existed."

Did the appropriation made in favor of J. O. Nixon create a debt against the State, or was it only a recognition of a debt existing prior to the constitutional amendment and unaffected by it?

The preamble to the act recites that, "Whereas the State of Louisiana, by act of March 22, 1866, and by her contract with James O. Nixon, as public printer, engaged to pay him in cash, monthly, certain rates and prices for public printing by him to be executed; and whereas said Nixon executed his bond for ten thousand dollars to the State for the faithful performance of his duties as public printer; and whereas the said Nixon did faithfully and promptly execute the duties incumbent on him by law; and whereas the State paid him only part in cash and the remainder in warrants, which he was compelled to receive or get nothing at all; and whereas to comply with his engagements to the State he was compelled to sell these warrants at various and heavy discounts; and whereas good faith of the State requires that it should make good the losses incurred," etc.

It appears from these recitals that the State had settled with J. O. Nixon in full for the work done by him as public printer, and that his necessities compelled him to sell at a discount his warrants, received

in the settlement. If instead of the State it had been a private individual who had contracted with Nixon and who had given his note in settlement, could Nixon have enforced his claim for losses in consequence of the sale of the note? Certainly not. After the settlement aforesaid and the sale of the warrants the State did not owe Nixon, but the holder of the warrants. Therefore the act No. 32, if valid, necessarily created a debt.

But it is contended by the relators that the appropriation does not create a debt, " because the money is presumed to be in the treasury." This raises the very serious question whether or not the Legislature can make appropriations, unless there be money to meet the warrants authorized thereby, either actually in the treasury or provided for by the revenue bill?

The power of appropriation is the right to apply to public purposes money in the treasury. Article 104 of the Constitution declares:

"No money shall be drawn from the treasury but in pursuance of specific appropriations made by law." ·

An appropriation is an authorization to the Auditor to check upon the treasury for moneys there deposited. If, therefore, the revenues be inadequate to meet the interest of the public debt and the current expenses of the necessary State agencies to preserve the government, an appropriation (whereby the liabilities of the State are increased) for any other purpose than the support and maintenance of the machinery of government is a debt within the meaning of the constitutional amendment, which declares "that prior to the first day of January, 1890, the debt of the State shall not be so increased as to exceed twenty-five millions of dollars."

It is further contended that the prohibition in the constitutional amendment is inoperative until the Legislature shall provide by law how to carry it into effect. And the case of Groves v. Slaughter, reported in 15 Peters 449, is relied on to support the position. The case is wholly inapplicable.

That there are provisions of the Constitution which require legislative action to carry them into full operation, can not be doubted, but it is equally certain that there are other provisions of the Constitution which are effective independently of the action of the General Assembly. This amendment does not require legislation to be operative. 13 Barb. 63 and 188. It is a check upon the General Assembly itself, and its efficacy is independent of the legislative will. The proper way for the Legislature to give effect to this amendment is not to pass laws for its enforcement, but to refrain from enacting laws in violation of its commands.

The evidence shows that the revenues of the State are inadequate to the expenditures.

We are, therefore, constrained to declare that the act entitled "An act for the relief of James O. Nixon, late public printer," passed at the General Assembly of the State of Louisiana on the first day of March, 1871, is unconstitutional, null and void.

It is therefore ordered, adjudged and decreed that the judgment of the district court be affirmed, with costs of appeal.

Rehearing refused.