## COPE v. LOUISIANA STATE LIVE STOCK SANITARY BOARD.

No. 5466.

Court of Appeal of Louisiana. Second Circuit.

June 1, 1937.

Rehearing Denied June 30, 1937.

Writ of Certiorari Denied Nov. 2, 1937.

Isaac Wahlder, of Alexandria, for appellant.

Leo Gold, of Alexandria, for appellee.

HAMITER, Judge.

In compliance with certain live stock regulations and laws of this state, plaintiff delivered his 5-year old mule to representatives of defendant on March 19, 1936, in order that it might be dipped in an arsenic solution. On that same date the dipping took place at Willis' vat in Rapides parish. Nine days thereafter, or on March 28, 1936, it died.

Plaintiff charges in this suit that the mule was in perfect condition and health prior to the occurrence of the dipping; that defendant's representatives, while acting in the scope of their employment, placed a rope about the mule's neck and pulled it into the vat; that the pulling and tightening of the rope caused it to strangle and to inhale and absorb quantities of arsenic solution into its lungs and stomach; and that these negligent acts resulted in a poisoning of such organs, and ultimately its death.

Damages in the sum of $175 are sought herein. Of this amount, $150 is claimed as the value of the mule, while the balance is for the loss of its use.

Defendant filed pleas to the jurisdiction ratione personæ and ratione materiæ, and exceptions of no cause and no right of action. These were overruled.

With full reservation under its pleas and exceptions, defendant answered, generally denying the allegations of the petition.

A trial of the merits resulted in a judgment in plaintiff's favor for $135; this being the proven value of the animal. Defendant appealed, and plaintiff has answered the appeal asking that the judgment be increased to $160.

In this court, defendant again urges the above-mentioned pleas and exceptions.

The plea to the jurisdiction ratione personæ presents the question of whether or not the suit should have been brought in the district court of East Baton Rouge par-

ish, the admitted domicile of defendant, instead of in Rapides parish. It is the general rule in all civil matters that one must be sued before the court having jurisdiction over the place where he has his domicile. Code Practice, art. 162. An exception to this rule, however, is that where an act is committed for which an action for damage lies, the suit may be brought in the parish where the damage is done. Code Practice art. 165, par. 9. By virtue of this last-mentioned provision, we think that the action was properly instituted in Rapides parish where the dipping and damage occurred.

■ Under the exceptions of no cause and no right of action and plea to the jurisdiction ratione materiæ, defendant's counsel offers two objections. It is first contended that the fixing of the value of the animal by a board or commission of appraisers, pursuant to section 3 of Act No. 6 of 1930, was a condition precedent to a suit for recovery, and as the petition herein does not allege that plaintiff submitted his claim to that body for an appraisement, it was fatally defective. This contention, in our opinion, is without merit. The referred to provision reads: "All cattle, horses, mules, jacks, and jennets killed or injured in the actual process of dipping done under the supervision of the Louisiana State Live Stock Sanitary Board, or its quarantine inspector, upon satisfactory proof, shall be compensated for to the owner or owners thereof by the Louisiana State Live Stock Sanitary Board upon the value fixed by a board or commission of appraisers, which board or commission shall be the same board or commission provided for in Section 11 of this act."

According to section 11 of that act, such board or commission "shall consist of three members in each parish in each zone where tick eradication has begun, which said board shall be appointed for each parish as follows: One member shall be appointed by the Police Jury, one by the District Judge, and one by the Louisiana State Live Stock Sanitary Board."

As we view the quoted statutory provisions, the owner of stock killed or injured through the process of dipping is required to merely file his claim with the Louisiana State Live Stock Sanitary Board, and produce proof in support thereof. If the latter finds the proof to be satisfactory, payment is made on the basis of the value decided upon by the commission or board of appraisers. Should the claim be rejected, as was plaintiff's herein, there is no necessity for an appraisement to be made. Consequently, the functioning of the commission or board of appraisers is not a condition precedent to the enforced collection of a disputed claim. As a matter of fact, the evidence in the record, adduced on the trial of the merits, reveals that no board or commission of appraisers, as contemplated by sections 3 and 11, has ever been appointed in Rapides parish.

■ It is next urged that defendant is an arm, instrument, and agency of the state, and cannot be sued without express legislative authorization and consent; and that such has not been given. This furnishes a more serious question. It is a fundamental and well-recognized rule of constitutional law that a state may be sued in its own courts only when it has consented thereto. State ex rel. Louisiana Trust & Savings Bank v. Board of Liquidation of State Debt, 136 La. 571, 65 So. 745. And our examination of the statutes of this state has not revealed any legislative enactment which specifically authorizes the filing of suit against the Louisiana Live Stock Sanitary Board, the defendant herein, and admittedly a state agency.

■ However, another principle which is also firmly embedded in the basic law of Louisiana, and forms a part of the Bill of Rights of our Constitution, is: That "private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." Section 2, article 1. And this provision is self-executing. By reason of it, an agency or political subdivision of the state which has taken or damaged private property for public purposes without paying adequate compensation may be sued therefor, irrespective of the existence or nonexistence of legislative authorization for the suit. "A constitutional prohibition against taking private property for public use without just compensation therefor is self-executing, even though the method of ascertaining such compensation is left for legislative determination." 12 Corpus Juris, verbo, "Constitutional Law," § 55. "It is generally recognized that legislation is unnecessary to enable the courts to give effect to constitutional provisions guaranteeing the fundamental rights of life, liberty and the protection of property." 6 Ruling Case Law, verbo, "Constitutional Law," § 55.

In the case of Chick Springs Water Co. v. State Highway Department, 159 S.C. 481,

157 S.E. 842, 850, the Supreme Court of South Carolina had under consideration a provision of the constitution of that state (article 1, § 17) which reads: "Private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made therefor." The court in its opinion said:

"No valid distinction can be drawn between cities, counties, and other political subdivisions, referred to in the Faust and other cases, on the one hand, and the state highway department on the other. All are agencies of the state and all derive their immunity from the same source, the state, and upon the ground that, being agencies of the state, they are in effect the state itself. Counties, cities, and other political subdivisions are held liable where they take property, not upon the ground that they are authorized by statute to be sued, but because of the constitutional provision requiring compensation to be made for such taking. This protection is afforded to the humblest citizen by the Constitutions of the the state and the United States, and neither government can itself or by any statute or through any agency take property without paying compensation. 'Immunity from suit' cannot avail in this instance, and, if no statute exists, liability still exists, because as to this provision the Constitutions are self-executing.

"To hold otherwise would be to say that the Constitution itself gives a right which the Legislature may deny by failing or refusing to provide a remedy. Such a construction would indeed make the constitutional provision a hollow mockery instead of a safeguard for the rights of citizens."

Having determined that the above-quoted provision of the Louisiana Constitution is self-executing, we now say that if the death of the mule through the acts of the defendant's representatives, as alleged by plaintiff, was a taking or damaging of plaintiff's property for public purposes, the petition is invulnerable from the attacks under discussion.

Plaintiff in the case of De Moss v. Police Jury of Bossier Parish, 167 La. 83, 118 So. 700, 702, 68 A.L.R. 336. was the lessee of a plantation. Running along its edge was a local public road which was in need of widening and was under defendant's supervision. Defendant let a contract for the performing of the necessary work. The contractors, under the direction of the supervising engineer and in order to obtain some needed dirt for the project, removed a fence which inclosed plaintiff's crop and failed to restore it. As a result of this removal, cattle entered the field and damaged the crop, and plaintiff sued the police jury to recover the damages sustained. The Supreme Court decreed the defendant liable on the theory that there was a taking or damaging of plaintiff's property for public purposes without due process of law and without an adequate compensation. Its opinion recited, in part:

"Here the plaintiff's crop was damaged as the proximate and natural result of the widening of the road, for if the width of the road had not been extended, there would have been no necessity of tearing down the fence, and if the fence had not been torn down, the cattle would not have destroyed plaintiff's crop.

"To adopt the theory of the Court of Appeal, and deny plaintiff's right to recover for the damage to his crop, would, in the language of Justice Manning, 'convert the constitutional protection into a false pretense and practically make it only a promise to the ear which it breaks to the hope.' "

The De Moss Case was cited approvingly in the cases of Green v. Board of Commissioners of Levee District, 163 La. 117, 118, 111 So. 619, and Booth v. Louisiana Highway Commission, 171 La. 1096, 133 So. 169. The Levee Board was held liable in the Green Case for the taking of some property, and also for damages sustained by plaintiff's residence when branches and trunks of trees were thrown thereon through the negligent exploding of large charges of dynamite.

Other cases in the Louisiana jurisprudence involving the doctrine just discussed are Murff v. Louisiana Highway Commission, 19 La.App. 847, 140 So. 863, and Marbury v. Highway Commission (La.App.) 153 So. 590.

In the case at bar, it cannot be disputed that the dipping of the mule was for a public purpose and in the interest of the state's welfare. The Legislature, in the year 1930, directed defendant to initiate and carry on a systematic dipping of all cattle, horses, mules, jacks, and jennets infested with or exposed to the cattle fever tick (margaropus annulatus), and suitable and necessary yearly appropriations of funds for the work have been made. By that action it has recognized that the elimination of such ticks will result in many benefits to the state,

among these being the furtherance of the live stock industry herein; and the alleged negligent acts of defendant's representatives in employing the rope and pulling the mule into the vat of arsenic solution was committed by them while engaged in this tick eradication work.

Using some of the deductive reasoning of Mr. Justice Thompson found in the opinion of the De Moss Case, it might be said that the mule, according to the allegations of plaintiff's petition, was killed as the result of the state's tick eradication program, for if this program had not been placed in effect and carried on, there would have been no necessity of dipping the mule, and if it had not been dipped its death would not have resulted. Consequently, there was a taking or damaging of plaintiff's property for public purposes.

Defense counsel relies on and quotes from the cases of Kilberg v. Louisiana Highway Commission, 8 La.App. 441, Orgeron v. Louisiana Power & Light Co. et al., 19 La.App. 628, 140 So. 282, and Perry v. Louisiana Highway Commission (La. App.) 164 So. 335. These cases are not here applicable, for the reason that they were for purely speculative damages growing out of torts for which there was no liability imposed upon the state agencies by constitutional provision or legislative enactment.

It is therefore our opinion that defendant's pleas and exceptions were properly overruled by the trial court.

██ Passing now to a consideration of the merits, we find that plaintiff purchased the animal on March 7, 1936, for the sum of $135, and received delivery two or three days thereafter. He used it in plowing from that time until the day of the dipping. It was in a healthy and sound condition, had good wind, ate heartily, and performed its work well. Pursuant to a written notice signed by Calvert Beauregard, the inspector in charge of the Willis vat, plaintiff sent his animal to be dipped the morning of March 19, 1936. While being led to the vat, it became fractious and balky, and succeeded in breaking a new bridle which it wore. Thereupon, a rope was looped around its neck, and the task of pulling and pushing the animal into the vat began and was concluded. On emerging therefrom, it was coughing, shaking its head, and a fluid was emitted from its nostrils. The attention of Inspector Beauregard was called to this condition, and he instructed the boy who had charge of the mule to take it home and to inform him as to later developments.

When the animal was returned to plaintiff's place, it lay down and thereafter refused to partake of food and water. Its bowels became very loose, and "white foam" ran from its nose and mouth. Plaintiff informed Inspector Beauregard of this condition, and was told that nothing could be done about the mule unless it died; and if death took place a claim could be sent to the Louisiana Live Stock Sanitary Board and an immediate settlement would follow.

After the mule's death, it was dissected and an investigation was made by plaintiff and Inspector Beauregard of its internal organs. With reference to this, the latter testified:

"Q. Were you present when the mule was cut open? A. Yes, sir, I was there.

"Q. Did you examine the insides of the mule? A. I looked at the insides of the mule, looked to me like it was burned by the dip, but for me to tell you the dip killed him I don't know, but the insides of his stomach looked like—we had some cattle licked some dip and they died and they looked just like this one.

"Q. Did you look at the lung tissue also? A. Yes, sir, I looked at it.

"Q. Did it all look the same way? A. Everything looked burnt."

The internal organs of the mule were also viewed by Mr. H. E. Willis, a live stock owner, and a former vat inspector. He testified that two of his cattle were previously killed by arsenic solution, and he dissected them for an inspection. The condition which he found in them was similar to that found in plaintiff's animal.

Our attention is called by defense counsel to the fact, which is conclusively shown by the testimony, that defendant's representatives at the vat, there being three of them, had nothing to do with the actual placing of the rope about the mule's neck and the pulling or dragging of it into the vat. This, in our opinion, is immaterial in so far as defendant's liability is concerned. These representatives had complete charge of the dipping operations, and gave repeated and unequivocable instructions that all animals must be dipped, and they were present when the strangling occurred and did nothing to prevent it.

It is also suggested that the animal died from a disease rather than from the strangulation and arsenic poisoning. In this

connection the testimony of two experts was offered which was to the effect that death from arsenic poisoning usually resulted within four days after dipping, rather than nine days as in this case; and that approximately two gallons of the regular dipping solution were required to cause an animal's death, and the obtaining of this quantity by the mule was impossible. This testimony is persuasive, and was given by persons well versed in veterinary science; however, the trial judge obviously concluded that it could not prevail over the positive testimony of the persons who saw and inspected the animal both before and after the dipping, and we are unable to say that he manifestly erred.

The evidence offered by plaintiff in support of his claim of $25 for the loss of the use of the mule is insufficient to warrant our amending the judgment so as to allow it.

We think that the judgment of the district court is correct, and it is affirmed.