STATE ex rel. NOE v. KNOP, Civil Sheriff.
No. 17205.

Court of Appeal of Louisiana. Orleans.
June 12, 1939.
Rehearing Denied Oct. 2, 1939.

D. M. Ellison, Atty. Gen., and Frank Wm. Hart and Charles J. Rivet, both of New Orleans, for appellant.

James David McNeill, of New Orleans, for appellee.

**JANVIER, Judge.**

The relator, James A. Noe, prays for the issuance of alternative writs of mandamus, seeking thereby to compel Louis Knop, Jr., Civil Sheriff for the Parish of Orleans, to permit relator "to take photographs of the poll books containing the names of voters of the Parish of Orleans".

He alleges that on Tuesday, March 7, 1939, at about 10:30 a. m., he "presented himself at the office of the said Louis Knop, Jr. and requested permission of the said Louis Knop, Jr. in his capacity as Civil Sheriff for the Parish of Orleans, to take photographs of the poll books containing the names of the voters of the Parish of Orleans"; that he was provided "with all of the equipment necessary for the taking of said photographs" and that he "offered to make the said photographs in such a way as would not interfere with the Civil Sheriff in the performance of his duties".

Knop filed exceptions of vagueness and of no cause of action and, with a reservation of his rights under these exceptions, filed answer admitting that he is the Civil Sheriff and in effect admitting that the poll registration books of the Parish of Orleans are in his custody, but averring that "* * relator's visit to respondent's office with the equipment referred to, disrupted the operations of his office and delayed the performance of his duties as the executive officer of this court; that relator's equipment required for its use the consumption of electrical current, which is paid for with public funds"; and Knop further averred that "if the law did permit of the taking of photographs, the taking of such in the manner proposed by the relator would cause serious inconvenience to the operations of respondent's office, to the detriment

of the duties which he and his deputies and employees are required to perform * * ".

Both exceptions were overruled and, after trial on the merits, there was judgment in favor of Noe making peremptory the writ of mandamus and, accordingly, ordering respondent to give permission for the photographing of the said poll books.

From this judgment Knop has appealed suspensively to this court.

■ According to the brief filed on behalf of Knop, the exception of vagueness is directed at the fact that the prayer of Noe does not in detail "designate any specific acts which he demands of respondent".

The answer to this contention lies in the fact that Noe does not demand of the Sheriff any affirmative act at all. He merely asks that the Sheriff refrain from interfering with the taking of the photographs; only that the Sheriff grant permission—not that he do anything else. In other words, while relator seeks a mandamus, he in effect requests that he be granted the effect which would follow from the issuance of an injunction. This demand was set forth with sufficient clarity to permit of compliance by anyone desiring to comply.

The questions on which the entire legal issue depends are presented by the exception of no cause of action, which we shall next consider.

Through this exception Knop maintains that, as a matter of law, the constitutional provision on which Noe relies does not give to him, nor to anyone else, the right to demand the permission which is sought.

Prior to the approval by the People of this State of Act No. 230 of 1934 as a constitutional amendment to Section 2 of Article VIII of the Constitution of 1921, it was required of any prospective voter, as one of the prerequisites to the right to vote in any year, that he produce poll tax receipts showing the payment by him of a poll tax during the two preceding years. By the constitutional amendment referred to, there was substituted the requirement that each prospective voter should, during the two preceding years, register his name in records to be kept for that purpose and obtain certificates showing those registrations. That constitutional amendment reads as follows:

"No person less than sixty (60) years of age shall be permitted to vote at any election in the State who shall not, in addition to the qualification above prescribed, on or before the 31st day of December, of each year, for two years next preceding the year in which he offers to vote, register in the poll book, such book to be kept by the sheriff of each parish. Such registration shall be made by the voter signing his name on the poll book, and if he is unable to write, by the sheriff or one of his deputies signing the voter's name and the voter making his mark thereto in the presence of two witnesses attesting to the same thereon. The post-office address, his precinct and ward, and where there is such the street address of the voter, shall also be entered on the said poll book. The said sheriff shall keep the said poll book open for registration and inspection at least eight hours between eight o'clock A. M. and six o'clock P. M. on all days except Sundays and legal holidays, and the said poll book shall be a sewed, bound volume; any one desiring to take a photograph of the same or any part thereof shall be permitted so to do by the said sheriff. The said sheriff or his deputies shall legibly write the name of such voter registering immediately beside the voter's signature. Within five days after the first day of each month the said sheriff shall forward to the Registrar of Voters of the Parish the names of those registering, together with their post office address, ward and precinct, and where possible the street address of said voters, separating the list of those whose registration has not been made by their own signatures, with the names in each case of the sheriff or deputy sheriff signing such voters' names and the witnesses attesting to the same. Registration in said poll book for the year 1934 may be made up to and including the 31st day of May, 1935. Poll book for the Parish of Orleans shall be in the office of the Civil Sheriff.

"Every person, before being allowed to vote, shall exhibit to the commissioners of election his certificates of registration, issued by the sheriff, on the official form, or duplicates thereof in the event of loss, for two years as above prescribed. Or proof of registration on such poll books may be made by certificate of the sheriff, which shall be sent to the commissioners of the several voting precincts, showing a list of those who have so registered as above provided, and the dates of registration. It is hereby declared to be forgery, and punishable as such for any sheriff, or other person to antedate or alter, or fraud-

ulently issue a poll book registration certificate. The provisions of this Article as to registration in the poll book shall not apply to persons who are deaf and dumb, or blind, nor to persons under twenty-three (23) years of age who have registered in accordance with this Article, nor, in time of war, to citizens of the State, in the military or naval service of the United States. These provisions shall not apply during 1934 to any person who shall have paid a poll tax during the years 1932 and 1933. * * *"

The contention of Noe is that he, or anyone else, without assigning any reason, may demand permission to photograph any such poll book, or any part thereof, and to take as many photographs as he desires. This right is said to be based on the following provision, which we again quote from the above set forth amendment: "* * * any one desiring to take a photograph of the same or any part thereof shall be permitted so to do by the said sheriff."

The sheriff makes the following contentions:

(1) That throughout the entire amendment, with one exception (where the books of the various parishes are referred to), the word "book" is used in the singular and that, since it is conceded that in the Parish of Orleans there are many books, it is obvious that it could not have been the intention of the framers of the amendment and of the people who adopted that it should apply to the poll "books" which are kept in the Parish of Orleans.

(2) That the provision requires that permission be granted for the taking of "a" photograph and that, therefore, the demand of Mr. Noe, who requests permission to take more than one photograph, exceeds the right granted even if any right at all is actually granted by the amendment.

(3) That there is no provision in the amendment which places upon the "Civil" Sheriff of the Parish of Orleans any duty other than that of merely allowing the poll books to remain in his office and that nowhere in the amendment is there placed upon said Civil Sheriff of the Parish of Orleans the duty of permitting the said books to be photographed.

(4) That even if it be conceded that the people of the state, in adopting the amendment, intended that the word "book" in the singular should contemplate the many books which are required in the Parish of Orleans, and even if it be conceded that, in declaring that the poll books for the Parish of Orleans "shall be in the office of the Civil Sheriff" it was intended that the said Civil Sheriff should perform, in connection with the books, the duty of granting permission to photograph the same, still no mandamus should issue because the provision relied upon is not self-executing in that it does not prescribe the means by which the right demanded shall be protected, nor the details with which anyone desiring to photograph the books must comply, nor the details of the duties which the said Sheriff must perform in allowing such books to be photographed.

(5) That, in any event, no mandamus should issue because there is no ministerial duty in the Sheriff to permit the photographing of such books because it is obvious—so Knop contends—that the said Sheriff must have discretion to determine whether the person who desires to photograph the books has a lawful purpose. since, if he has no such discretion, then any commercial agency desiring to obtain the names for advertising purposes, or any forger desiring to copy the signatures for illegal purposes, would have the right to obtain the photographs of the signatures of the most prominent persons in the community. The contention is that, for this reason, it must have been intended that the Sheriff should have discretion to refuse to grant permission for any such improper purpose and that, if he has any such discretion, no mandamus should issue since mandamus will lie only where there is a clear, ministerial duty, and that there can be no such clear, ministerial duty if the person sought to be compelled to act is permitted any discretion.

■ (1) First we consider whether the singular, "book", should be held to contemplate the many volumes which are required in the Parish of Orleans. We can reach no conclusion other than that it was intended by the framers of the amendment and by the people, when they approved it, that it was to be operative in the Parish of Orleans as well as in the other parishes. If they did so intend, it is obvious that when they used the word "book" in the singular, they meant to include all necessary volumes in the Parish of Orleans, and, in fact, in any other parish in which it is necessary that more than one volume

be used, because we cannot conceive that it was not realized that it would be a physical impossibility to prepare one book large enough to contain the names of all prospective voters in Orleans Parish, or in any other parish in which more than one volume is absolutely essential.

■ Counsel for the Sheriff argue that there is no authority for more than one book and that this is evident because it is provided that "the said poll book shall be a sewed, bound volume" and they say that this requirement cannot be complied with if two or more books are used, and that, therefore, it is obvious that the amendment was not intended to apply in any parish in which more than one book is required.

All that was intended when it was required that the book be sewed and bound was that the leaves thereof should be bound together in such a way that none of them could be removed and that no new ones might be inserted.

■ It is true, as counsel maintain, that where language of an enactment is plain and unambiguous, there is no right in the courts to attempt, by construction, to change the meaning of that unambiguous language. But it is equally true that it is not the duty of the courts to refuse to enforce the obvious and plain intent of the people as it is expressed in their enactments merely because, in the language used, the obvious intent may not have been thoroughly expressed.

■ Counsel say "when the intention is clear there is no room for construction and no excuse for interpolation."

■ That is quite true. But we think that the intention here is so clear that, to refuse to follow it by holding that because the word "book" is used in the singular, the right to photograph "books" was not intended, would be to refuse to follow the obvious intent of the framers of the statute and of the people who adopted it as a constitutional amendment.

■ Counsel concede that it is true that in some instances, where there is ambiguity, courts should attempt to discover the intent of an enactment and that it is established that, where the language of a statute or of a constitutional amendment must be interpreted in an effort to carry out the obvious intent, such enactment may not be broadened or extended by interpretation, but that the authorities are to the effect that, though interpretation may be resorted to to restrict, it may not be availed of to extend or to enlarge.

■ But in many instances the courts—including the Supreme Court of the United States—have shown plainly that the intent of the enactment is to be sought and that it is the intent which governs, even if that intent goes beyond the actual words of the enactment. We need go no further than the case of Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 788, 47 L.Ed. 1016, cited by counsel for both parties, to discover this. In that case the Supreme Court of the United States quoted with approval from one of its earlier decisions, Smythe v. Fisk, 23 Wall. 374, 23 L.Ed. 47, as follows: "A thing may be within the letter of a statute and not within its meaning, and within its meaning, though not within its letter. The intention of the lawmaker is the law."

Surely the statement that "a thing may be within the meaning of the statute, though not within its letter", followed by the statement that the intention of the lawmaker is the law, is a clear expression by the Supreme Court of the United States that the intention may be followed even though it extends the scope beyond the strict words of the enactment.

And in the same opinion the Supreme Court quoted again with approval from an expression found in People ex rel. Attorney General v. Utica Insurance Company, 15 Johns. 358, 381, 8 Am.Dec. 243 a New York case, in which the court said: "A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter * * *."

■ We find this a clear expression of the view that the words of a statute may be extended by interpretation so as to include as within the intention of the framers anything necessarily implied by the actual words. In Marsh v. Sanders, Sheriff, 110 La. 726, 34 So. 752, 755, is found a very interesting decision concerning the right of the courts to extend, by interpretation, the language of statutes so as to include what was intended by the legislature. In that case the plaintiff sought to enjoin the defendant sheriff from interfering with his "inspection" of the poll books of the parish. One of the grounds on which the sheriff resisted was that the plaintiff had attempted to make memoranda from the books and had not limited himself to the inspection thereof.

The Supreme Court said: "The judge should have enforced the absolute statutory right of plaintiff to inspect, and the incidental right to take memoranda and copies".

If the interpretation sought by respondent to be placed upon the constitutional amendment is sound and if it has application where only one book is availed of, it would be a very simple matter indeed for those in charge of such poll records, either through necessity or by subterfuge, to provide more than one book, and by this method prevent the taking of photographs, even though the constitutional provision plainly indicates that, as a matter of public policy, such photographs must be permitted.

That the legislature itself—in fact, the same legislature which proposed the amendment—realized the physical necessity in some parishes for more than one book, is evident, and that the legislature interpreted the word "book" in the singular as including all of the volumes which might be necessary in any one parish is also very evident, for, in Act No. 38 of the Second Extraordinary Session of 1934, it provided for the carrying out of certain provisions of the said amendment which were not self-executing, and, in doing so, required that the State Board of Registration should furnish the books and should determine "the number of volumes which shall constitute the poll book for each parish". We call particular attention to the fact that here the word "book" is used in the singular. This interpretation of the word "book" by the same legislature which proposed the constitutional amendment is most significant, and counsel for respondent themselves concede in their brief that "it is * * * a recognized rule that construction by the legislature is of great weight".

(2) We next consider the contention that, since the enactment provides for the taking of "a photograph", Mr. Noe is not within his rights in demanding permission to take more than one photograph.

Most of what we have already said concerning the use of the word "book" in the singular applies to the use of the words "a photograph"—also in the singular. It is difficult to believe that it was the intention of the framers that any person should be limited to the taking of one photograph and, as a matter of fact, if that was the intention, it would be very simple indeed to resort to the subterfuge of employing the assistance of others, each to take a photograph.

Then, too, if the language is to be restricted to one photograph and that by "anyone", then, would it not follow that, as soon as "anyone" has taken one photograph, the entire requirement of the constitutional amendment that anyone be permitted to take a photograph would be completely complied with and that never, at any time in the future, could anyone else take any other photograph?

(3) We next consider respondent's contention that the writ of mandamus should not be perpetuated for the reason that the amendment does not place upon the Civil Sheriff for the Parish of Orleans any duty respecting the poll book or books except that of permitting them to be kept in his office. The point which respondent would make is this: That no public official should be required by mandamus to do any acts except such as are clearly required of him by law; that he should not be compelled, by mandamus, to perform any duty except those which are mandatory and ministerial, and that, therefore, since the amendment contains no reference whatever to the Civil Sheriff for the Parish of Orleans except that which requires—and requires only—that he permit the books to be kept in his office, no other duties can be required of him.

Respondent points out that he is the Civil Sheriff for the Parish of Orleans and argues that, since there are provided by the Constitution, in Article VII, Section 89, two sheriffs for the Parish of Orleans, any provision in the amendment placing duties upon "the sheriff of each parish" cannot have reference to the Civil Sheriff; that, had it been intended to place those duties upon the Civil Sheriff, there should have been inserted some additional words to the effect that, wherever the word "sheriff" is used, the "Civil Sheriff" for the Parish of Orleans is intended. And it is argued from this premise that, since the provision that the permission to photograph the book shall be granted by the sheriff without any further provision to the effect that, in the Parish of Orleans, it is the Civil Sheriff who shall grant this permission, it is evident that no such duty was intended to be placed on any sheriff at all in the Parish of Orleans, and coun-

sel for respondent call attention to the fact that in only one place is mention made of the Civil Sheriff for the Parish of Orleans and that is in the provision which requires merely that the "poll book for the Parish of Orleans shall be in the office of the Civil Sheriff", but does not place upon that sheriff any other duties with reference to that book.

The intention of the framers of the enactment is indicated by that provision. Clearly it was recognized that the duties which are set forth in the other provisions of the amendment and which require "the sheriff" to do certain things should be definitely placed upon the shoulders of either the one or the other sheriff in the Parish of Orleans, and, therefore, the framers of the enactment chose the Civil Sheriff and provided that the said book should be in his office.

It is true that they did not add the requirement that the "Civil" Sheriff should perform all the other duties, but the intention that he should do so is so clearly evident that we think that what we have already said with reference to interpreting legislative enactments and constitutional amendments by attempting to seek out the intention of the framers is applicable here. And it is very evident that the Sheriff, respondent, is of the opinion that these duties are placed upon him, for otherwise, why should he have refused the permission, if, in fact, it is not his duty to have anything at all to do with the books other than to provide a place in which they may be kept?

 (4) Respondent asserts that the constitutional provision relied upon is not self-executing and argues that it is nothing more than a declaration of policy since it does not prescribe the means by which the rights granted may be protected, nor by which the duties imposed may be enforced.

It is true that, where a constitutional provision is nothing more than a declaration of policy and, in adopting such a constitutional provision, the people have indicated their intention to leave to the legislature the duty of prescribing the means by which the said policy shall be carried out, such provision is not self-executing and is of no effect until the necessary assisting legislation has been enacted. It must always be remembered, however, that it is the will of the people which should be paramount and that the only justification for failure to enforce a constitutional provision because of the absence of enabling legislation is the presumption to be sometimes derived from the general language that the people themselves did not intend the provision to have effect without legislative assistance. But if, from the language, it seems evident that there was an intent that the provision should be enforced without the necessity of further action on the part of the legislature, it would obviously be to permit the legislature to thwart the will of the people to hold that, because the legislature has not acted, the constitutional provision can have no effect. The question always is: "What did the people intend?" Did they mean to leave further action to the legislature, or did they intend that their constitutional provision, without further action by the legislature, should carry out their will?

In Coguenham v. Avoca Drainage District et al., 130 La. 323, 57 So. 989, 991, the Supreme Court of Louisiana quoted with approval the following language: "'The question in every case is whether the language of a constitutional provision is addressed to the court or the Legislature. Does it indicate that it was intended as a present enactment, complete in itself as definitive legislation, or does it contemplate subsequent legislation to carry it into effect? This is to be determined from a consideration both of the language used and of the intrinsic nature of the provision itself. If the nature and extent of the right conferred and of the liability imposed is fixed by the provision itself so that they can be determined by the examination and construction of its own terms, and there is no language used indicating that the subject referred to the Legislature for action, then the provision should be construed as self-executing, and its language as addressed to the courts.' Willis v. Mabon, 48 Minn. [140], 150, 50 N.W. [1110], 1111, 16 L.R.A. 281, 31 Am. St.Rep. 626."

In State ex rel. Curtis v. Ross, 144 La. 898, 81 So. 386, 387, the Supreme Court said: "A Constitution is but an expression of legislative will, like a statute; if, therefore, the legislative will be sufficiently expressed, no more is necessary. The form of language is insignificant."

 It must be borne in mind, also, that the modern doctrine favors the presumption that constitutional provisions were intended to be self-operating. In

Louisiana this doctrine is approved and the reasons for the rule are well and fully set forth in State ex rel. Curtis v. Ross, supra, as follows:

" 'When the federal Constitution and the first state Constitutions were formed a constitution was treated as establishing a mere outline of government, providing for the different departments of the governmental machinery, and securing certain fundamental and inalienable rights of citizens, but leaving all matters of administration and policy to the departments created by the Constitution. This form of organic instrument gave rise to a general presumption that legislation was necessary in order to give effect to the provisions of the Constitution, and that its terms operated primarily as commands to the officers and departments of the government. During the last fifty years state constitutions have been generally drafted upon a different principle, and have often become in effect extensive codes of laws, intended to operate directly upon the people in a manner similar to that of statutory enactments. Accordingly the presumption now is that all provisions of the Constitution are self-executing.'

"And why not, especially in the case of our own Constitution, which contains almost as much purely administrative legislation as the Revised Statutes do, and is almost as long. The fact is, if the said provision is, sure enough, not self-executing, it is probably the only one of that character to be found in our Constitution."

See, also, State v. Flynn, 160 La. 483, 107 So. 314.

And even more recently, in two cases, Cope v. Louisiana Live Stock Sanitary Board, 176 So. 657, and Pelt v. Louisiana Live Stock Sanitary Board, 178 So. 644, it was held that the constitutional provision against the taking without just compensation of private property for a public purpose is self-executing and that no legislative assistance is required to accomplish the purpose expressed in Article I, Section 2 of the Constitution. In one of those cases, Cope v. Louisiana State Live Stock Sanitary Board, La.App., 176 So. 657, 660, the Court of Appeal for the Second Circuit quoted with approval the following language of the Supreme Court of South Carolina in Chick Springs Water Co. v. State Highway Department, 159 S.C. 481, 157 S.E. 842: " 'To hold otherwise would

be to say that the Constitution itself gives a right which the Legislature may deny by failing or refusing to provide a remedy. Such a construction would indeed make the constitutional provision a hollow mockery instead of a safeguard for the rights of citizens.' "

Counsel for respondent direct attention to the fact that it is obvious that legislative assistance was necessary for the carrying out of some requirements of the amendment and they point to Act No. 38 of the Second Extraordinary Session of 1934, which provides for the printing of, the payment for, and the distribution to the various sheriffs of registration certificates and of the volumes of the poll book, and they point also to Act No. 39 of the same session prescribing that certain punishments be inflicted upon the sheriffs who fail to carry out any of the provisions "relative to the registration of any voter in any poll book" and they maintain that, since legislative assistance was required to carry out those provisions and since no legislative assistance has been enacted for the provision relied upon here, the said provision cannot be self-executing and is of no effect.

But it is obvious that assistance was necessary for the carrying out of some provisions of the amendment which were clearly not self-executing, and we think that the failure of the legislature to enact legislation in aid of the provision relied upon here evidences the view of the legislature that that provision is self-executing. The fact that the legislature finds it necessary to pass assisting legislation in aid of some portion of a constitutional amendment or provision and does not render assistance to others does not mean that those portions, in aid of which no legislation was enacted, shall have no effect, but, on the contrary, indicates the view of the legislature that no such assistance is necessary.

As illustrative, let us examine the case of State v. Caldwell, 50 La.Ann. 666, 23 So. 869, 41 L.R.A. 718, 69 Am.St.Rep. 465. There the Supreme Court considered Article 116 of the Constitution of 1898, which, among other things, provided that "the General Assembly shall provide for the selection of competent and intelligent jurors" and also provided that certain indictments might be made by a vote of nine of a grand jury composed of twelve mem-

bers. It was argued that, since legislative assistance was required to "provide for the selection of competent and intelligent jurors" and since, to that extent, Article 116 was not self-operative, the other part should also be held not self-operative. The court said that, though the people had indicated, in the first quoted provision, an evident intent that the legislature should assist by providing for the selection of competent and intelligent jurors, no legislative assistance was necessary for the carrying out of the second provision for indictment by a vote of nine of a grand jury of twelve.

■ It is said that the amendment is not self-executing for the reason that it provides no penalty for its violation and that the Legislature intentionally failed to provide such penalty, for, in Act No. 39 of the Second Extraordinary Session of 1934—already referred to—they did provide for penalties to be inflicted upon the sheriff who refuses to carry out certain provisions "relative to the registration of any voter in any poll book". If it was intended that the act should have such limited application, then all that can be said is that there is no criminal penalty provided for failure to comply with the provision which is here relied upon by relator. But that does not mean that that provision is not self-executing merely because no penalty is provided for its violation. Injunction or mandamus is the obvious civil remedy.

■ It is said that the provision is not self-executing because it does not set forth the details and duties thereby imposed upon the sheriff. It is not necessary that every detail of a duty be specifically prescribed. Officials are presumed to possess sufficient intelligence to determine for themselves how these incidental details shall be performed if the object to be accomplished is set forth.

"If a master commands a servant to do a particular thing, without directing him in detail how he shall do it, it is a fair and necessary presumption that the servant is to exercise an intelligent discretion in doing the thing commanded to be done. Certainly affairs of state must be conducted on as equally intelligent lines as private business. Therefore, if the Constitution of the state commands a public officer to do a particular thing, without directing the manner in which it shall be done, and the General Assembly of the state has not, in the exercise of the authority conferred upon it, enacted any laws to facilitate the operation of the provision of the Constitution it necessarily follows that the officer who is required to perform this duty has implied authority to determine, in the exercise of a fair and impartial official discretion, the manner and method of doing the thing commanded; * * *". State ex rel. Hunt et al. v. Hildebrant, 93 Ohio St. 1, 112 N.E. 138, 140.

A further answer is that there are no affirmative duties imposed. The sheriff is required to do nothing and consequently no details governing his acquiescence are set forth, or are required.

In Bowie v. Lott, 24 La.Ann. 214, we find an interesting suggestion to the effect that, where constitutional provisions are prohibitory in their terms and "require only that the citizen, whether in his official or in his individual capacity, should refrain from disobedience of their provision", they are "self-acting". See, also, State ex rel. Salomon & Simpson v. Graham, 23 La.Ann. 402.

In 12 Corpus Juris, "Constitutional Law", section 109, page 731, is found the following: "* * * It is a settled rule of constitutional construction that prohibitive and restrictive provisions are self-executing and may be enforced by the courts independently of any legislative action, * * *." Citing in note: Gabisso's Succession, 119 La. 704, 44 So. 438, 11 L.R.A., N.S., 1082, 121 Am.St.Rep. 529, 12 Ann. Cas. 574; Bowie v. Lott, 24 La.Ann. 214.

While it is true that the provision relied upon by Noe is worded as though it requires some affirmative action, the truth is, as we have shown, that it is really "prohibitive" and "restrictive", for, while it requires the sheriff to "permit" the taking of photographs, in reality it prohibits him from interfering.

■ It will not do to say that, for the sheriff's protection, there should be a statutory setting forth of the time at which and the manner in which photographs may be taken, for it is well settled that such a purpose must be carried out without interfering with the work of the sheriff's office and that, if there is any such interference, the courts will protect the sheriff not because he has discretion to refuse to permit the taking of the photographs, but

because he is justified in requiring that they be taken with as little interference as is possible.

In Marsh v. Sanders, supra, the Supreme Court held that where the right to inspect the sheriff's poll books is given, the sheriff may not refuse to permit the inspection and may not refuse to permit the making of copies, or the making of memoranda, but the court said that, if the sheriff should find that interference would result because of the manner in which it might be attempted to make the memoranda, then the sheriff could find protection in the courts.

■ It is said to be significant that the amendment to Section 2 of Article VIII of the Constitution, which is the amendment here relied upon, contains no provision expressly declaring the intention that it is to be self-operative, and this significance is said to result from the fact that the same constitution, in the same article, contains a provision at the end of Section 23 making that section self-operative. It is argued that the principle, "inclusio unius est exclusio alterius", is applicable; that, since the people, in adopting the constitution, expressly provided that Section 23 of this article should be self-operative, the same people, in adopting the amendment to Section 2 of this article without any such language, must have intended that Section 2 should not be self-operative.

This conclusion does not necessarily follow. Section 23 of Article VIII, which is the corrupt practices section, provides certain punishments and exclusion of rights for illegally influencing voters, and these provisions had been contained in previous constitutions in language which evidently indicated the necessity for enabling legislation.

Since, in the earlier constitutions, it had been provided that such provision should be operative only on the passage of assisting legislation, it was thought advisable by the framers of the Constitution of 1921 that it should be declared that no such assistance should be required to put that section into effect. It did not follow that the people intended that no section other than 23 should be self-operative.

■ Counsel for respondent points to the historically interesting case, Groves et al. v. Slaughter, 15 Pet., U.S., 449, 500, 10 L.Ed. 800, as authority for the proposition that a constitutional provision is not self-executing if legislative assistance is required in order that it be carried out. In the cited case the Legislature of Mississippi, prior to the adoption of the constitutional provision in question, had been given by the prior constitution (of 1817) the power to prevent slaves from being brought into the state as merchandise. As the United States Supreme Court said, "the time and manner in which this was to be done, was left to the discretion of the Legislature". By the Constitution of 1832 it was provided that "the introduction of slaves into this State, as merchandise, or for sale, shall be prohibited from and after the first day of May, eighteen hundred and thirty-three". Const.Miss.1832, art. 7, § 2, Slaves. The question involved was whether or not this last quoted provision of the Constitution of 1832 was intended to be self-operative. The Supreme Court of the United States held that, in view of the fact that, by the prior constitution, the legislature was vested with authority to determine the "time" after which and the manner in which slaves should be prevented from being brought into the state as merchandise, all that the constitution of 1832 did was to fix the time at which the legislature must make the prohibition effective, but that it did not take away from the legislature the right to determine the other details concerning this prohibition since, by the earlier constitution, the working out of these other details had been left to the legislature. In other words, all that the Supreme Court said there was that, in view of other facts, the constitutional provision first above quoted should not be held to be self-operative.

The same may be said of the case of State v. Patton et al., 32 La.Ann. 1200, in which the Supreme Court of Louisiana held Articles 191–192 of the Constitution of 1879 to be not self-operative. There the Supreme Court found that, because of other provisions in the same constitution, it was evidently not the intention of the framers of that constitution to make these articles self-operative. Referring to the intention of the framers of the constitution, and with particular reference to these two articles, 191–192, the court said: "It is glaringly patent that their intention was to the very reverse, for they distinctly provided by articles 253 and 259 that *all laws, whether consistent or inconsistent,*

would continue in force, the former indefinitely, until changed; * * *". (Words emphasized by Supreme Court)

Bowie v. Lott, supra, is also relied upon as authority for the view that the constitutional provision here involved · is not self-operative. In that case the constitutional requirement read as follows: "All lands sold in pursuance of decrees of courts shall be divided into tracts of from ten to fifty acres." Const.1868, art. 132.

The court found that this provision was not self-operative for the reason that it did not require any particular official to divide the land and that it did not provide for the expense of surveys which might be necessary, et cetera. It is obvious that such a provision could not be held to be self-operative. We find it interesting to note that Article 198 of the Constitution of 1898, providing for the payment of the annual poll tax, which was the requirement of an earlier constitution and which requirement has since been superseded by the amendment to the Constitution of 1921,—on which amendment this litigation is based— was held by the Supreme Court, in State ex rel. Ball v. Cain, 52 La.Ann. 2120, 2123, 28 So. 226, 228, to be self-operative. After discussing the meaning of various words in the article, the Supreme Court said: "But, whatever may be its meaning, the article is complete in itself. It is no mere direction to the legislature. It requires no act of the general assembly to carry it into operation, nor to give it force and effect. It is self-acting. It is an executory mandate."

 (5) We next consider the contention that the public official, to-wit, the Sheriff, must be granted discretion to determine whether the person who desires to take the photographs is actuated by a proper motive, and that, if the Sheriff has such discretion, then the writ of mandamus should not issue since no public official should be required, by mandamus, to perform any act unless he has no discretion in the premises and unless he must follow a clear ministerial duty. If there is discretion in a public official in the sense that he, in his judgment, may or may not perform the act which is demanded of him, then ordinarily mandamus will not lie to compel him to do so, for it is true that it will only lie to compel him to perform a clear ministerial duty, and it is on this basis that respondent contends that, if the

Sheriff is given the right to determine whether anyone who desires to photograph the poll books is actuated by a proper motive, he may not be compelled by mandamus to submit, and it is argued that the Sheriff must be given this discretion since, if he is not possessed of it, he must permit anyone—even a forger with criminal intent—to photograph the signatures of the community's most prominent citizens. It is also argued that, if he has no right to refuse, then the work of his office may be seriously hampered, the electric current paid for by the public may be wasted, and serious disturbances may occur.

 It must always be conceded that the Sheriff may not be improperly interfered with in the work of his office and that, therefore—regardless of the mandatory self-executing nature of the constitutional provision—he may always require that the photographs be made in such a way and at such a time as will interfere as little as possible with the work of his office, and he may require that no disturbance be committed and that no expense be placed upon him or upon the public fisc. This, as we have said, was decided in Marsh v. Sanders, supra, in which the court held that, though it was the duty of the sheriff to permit the inspection of the records, he might rely upon the courts to protect him against the abuses or interferences which he might fear. The same may be said here, except that here, by insisting that the question be presented by an exception of no cause of action, the sheriff has challenged the right to take the photographs at all. Had he raised that question and shown that there might be an interference with his work, or that the electric current paid for with public funds might be wasted, surely protection against those abuses could have been afforded him. But, in considering the exception of no cause of action, we must assume the truth of the allegations of the relator that he offered to take the photographs without interference and without placing expense upon the sheriff, or upon the public fisc.

 It is true that it would not be correct to say that a forger, or any other criminal, because of the broad language of the all-inclusive word "anyone", should be permitted by mandamus to force the Sheriff to permit photographs to be taken for illegal, or possibly for improper commer-

cial purposes, and it is also true that, if the Sheriff should resist the attempt to accomplish any such improper purpose, the discretion might lie in the courts to protect the Sheriff in his refusal. But that fact does not mean that the sheriff himself has discretion to refuse. Although there may be in a public official a ministerial duty to perform some act, or to permit some act to be performed, the courts will protect such official in refusing if he makes it to appear that the public interest will be improperly affected, or that the act will work a public or a private mischief. In other words, even though the official may have no discretion, the courts have and will protect the official where, in the exercise of that sound judicial discretion, the official should be protected.

In Duncan Townsite Company v. Lane, 245 U.S. 308, 38 S.Ct. 99, 101, 62 L.Ed. 309, the Supreme Court of the United States said: "Mandamus is an extraordinary remedial process which is awarded, not as a matter of right, but in the exercise of a sound judicial discretion."

 It appears to us clear that, if the courts may exercise discretion in the granting of a writ of mandamus, it necessarily follows that the right will be refused where the courts, in the exercise of that discretion, feel that the official sought to be compelled has acted in the interest of the public, or has acted so as to prevent a public or private mischief, and that even though the official may be under a ministerial duty to act. It follows that, if the courts have discretion in protecting the official who refuses to carry out a clear ministerial duty, that official may be subject to mandamus where he refuses to carry out that duty without the justification of alleged interference with the public interest, or without the justification of alleged public or private mischief.

In Corpus Juris, Vol. 38, § 18, pp. 549–550, verbum "Mandamus", it is said: " * * * It is elementary that the court is not bound to allow the writ merely because the applicant shows a clear legal right for which mandamus would be an appropriate remedy, even though without mandamus the applicant for the writ would be without remedy. Even under these circumstances the court may deny the writ where by its issuance the public would be injuriously affected, * * * ".

And, in § 19, appears the following: "The interest of the general public will be considered in determining whether or not the writ should issue, and the writ may be refused where such interest would be injuriously affected. The writ will not issue to compel the performance of an act which will work a public and private mischief, as for instance acts which would be dangerous to health, or to life, or to property."

The principle that, though the right to mandamus exists, it will not be enforced where the courts feel that a public or a private mischief may result, is recognized in Louisiana. In State ex rel. Carey v. Dalgarn Construction Company, Inc., 168 La. 620, 122 So. 884, is found a case in which a stockholder in a private corporation sought, by mandamus, to compel the corporation to permit him to inspect its books and accounts. Among other defenses it was contended that his purpose was to harass the company and to pry into its affairs. Now, if he was entitled to that inspection as a matter of right, then there was no discretion in the company to deny him that right, and that he was so entitled was evident from the statement of the Supreme Court that "the various Constitutions of the state have uniformly secured to stockholders in corporations the right to inspect their books. Const.1879, art. 245; Const.1898, art. 273; Const.1913, art. 273; Const.1921, art. 13, § 4." The court held that he had that right, but added that there may be situations in which, though the right exists, it will not be enforced by the courts. The court said: "By 'public inspection' as used in these articles is meant, not the inspection of the idle, the impertinent, or the curious, those without an interest to subserve or protect, or when the object is manifestly in opposition of the interest of the company, but the inspection by those with a laudable object to accomplish, or a real or actual interest, upon which is predicated the request for information disclosed by the books. Though the right to inspect is the rule, and it is very seldom proper for the officers of a company to refuse to allow the examination, the refusal is justifiable under the facts and circumstances above stated. [State ex rel.] Bourdette v. New Orleans Gaslight Co., 49 La.Ann. 1556, 22 So. 815; Bourdette v. Sieward, 107 La. [258] 265, 31 So. 630; Legendre v. New Orleans Brewing Ass'n, 45 La.Ann. [669], 671, 12 So. 837, 40 Am.St.Rep. 243; Scott v.

President of Police Jury, 46 La.Ann. [278], 280, 14 So. 521; Marsh v. Sanders, 110 La. [726], 732, 34 So. 752."

If the shareholder has the right and mandamus will issue to protect him in that right, unless the corporation can show that he intends to exercise it for an improper purpose, and if, also, in spite of the fact that there is no discretion to refuse it, the corporation may refuse on a proper showing, then it is plain that the true rule is that a mandamus will issue unless the respondent shows to the satisfaction of the court—and the burden is on the respondent to show this—that the granting of the writ will work a public or a private mischief, or will injuriously affect the public.

Thus here, if the respondent contended that the relator had no proper interest to serve, or that his exercise of his right might injuriously affect the public, then the courts could determine whether the facts justified the refusal. Since these questions are not presented by the exception of no cause of action, that exception was properly overruled.

When we consider the merits of the case, it appears that, though there was a suggestion in defendant's answer that the work of his office would be interfered with and that the electric current paid for by the public would be used by the relator in the taking of the photographs, those reasons were not given by him when he refused to permit photographs to be taken, for it appears from his own testimony that his reason for refusing was because of "a ruling I had from the Attorney-General's office". After discussing the occurrences in the office, he was asked the question: "The reason why you did not give permission was because you were acting under the advice of your legal advisor, who was the Attorney-General of this State?" and his answer was "Yes".

Since the refusal was based solely on the legal advice that under no circumstances should the taking of photographs be permitted, we think that the issue on the merits of the case involved the identical question which was presented by the exception of no cause of action and that the decision thereon was correct.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is affirmed.

Affirmed.