Mario E. Dávila y Eduardo Flores, peticionarios, v. Superintendente General de Elecciones, demandado.

Número 519.

*Sometido:* 28 de julio de 1960. *Resuelto:* 1 de agosto de 1960.

*F. Ponsa Feliú* y *Álvaro R. Calderón, Jr.,* abogados de los peticionarios; *J. B. Fernández Badillo, Procurador General de Puerto Rico* y *Arturo Estrella, Subprocurador General,* abogados del demandado.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.*

El 20 de julio de 1960 los peticionarios, como organizadores y presidente y secretario provisionales del Partido Acción Cristiana, sometieron una solicitud de mandamus ante este Tribunal Supremo, para entonces en receso, e invocaron nuestra jurisdicción original "debido a la naturaleza urgente y de gran interés público" del asunto. Se solicitaba expidiéramos un auto de mandamus contra el Sr. Ernesto Mieres Calimano, Superintendente General de Elecciones, ordenándole permitiera a los peticionarios "inspeccionar y sacar copias, previo el pago de los derechos legales correspondientes, de las listas provisionales de los votantes de 1956". (¹)

Al siguiente día, el Juez Presidente señor Negrón Fernández, actuando en funciones de turno, dictó una resolución ordenando al demandado que "de tener causa para no acceder a la pretensión de los demandantes, presente su contestación a la solicitud en o antes de las 10:00 a.m. del día 28 de julio de 1960, y se convoca a las partes para la celebración de la vista correspondiente a las 2:00 p.m. de ese día."

El demandado sometió su contestación dentro del término concedídole. Aceptó algunos de los hechos descritos en la solicitud y negó otros, presentó dos defensas de ley y solicitó no se concediera el remedio pedido por los peticionarios.

Se celebró una vista el día 28 de julio ante el pleno de este Tribunal, luego de una convocatoria al efecto cursada por el Juez Presidente. Recibimos en esa vista prueba documental y oral (²) ofrecida por las partes. Estas renunciaron expresamente a su derecho a someter alegatos.

* NOTA DEL EDITOR: Esta opinión se emitió el 17 de marzo de 1961.

(¹) La prueba aclaró luego que la solicitud se refería a las listas provisionales de 1960.

(²) Solamente dos personas prestaron testimonio, el Sr. Eduardo Flores por los peticionarios y el Sr. Ernesto Mieres Calimano por la parte demandada.

El día 1 de agosto, luego de un detenido estudio y amplia discusión del asunto, dictamos la siguiente sentencia:

"A base de la prueba recibida y por las razones que oportunamente se expresarán en una opinión, el Tribunal concluye que:

"Primero: Desde el mes de noviembre de 1959, dos copias de las listas provisionales de inscripciones de votantes para el año 1960 fueron enviadas por el Superintendente General de Elecciones a todos los presidentes de las juntas locales de elecciones. Por lo menos una copia de dichas listas está destinada al uso público, lo que necesariamente lleva consigo el derecho de cualquier persona interesada a sacar copia de cualquiera de ellas en las oficinas de dichas juntas locales y en horas razonables, sujeto a la imposición de medidas adecuadas por el custodio de dichas listas a fin de mantener la seguridad de éstas y su disponibilidad para el público. Nada hay en la prueba que demuestre que en los primeros días del mes de junio de 1960, fecha en que los peticionarios por primera vez solicitaron del Superintendente se les expidiera copia certificada de dichas listas, no estuviesen disponibles las mismas—con excepción de las correspondientes a los precintos de Aguadilla, Arecibo, Río Piedras II, San Juan y Yabucoa—para ser inspeccionadas y copiadas por los peticionarios, ni nada hay en la prueba que indique que no lo están al presente. En consecuencia, con excepción de los precintos ya mencionados, los peticionarios tienen a su disposición y han tenido desde que comenzaron el proceso de inscripción de su partido, y en varias ocasiones han utilizado, un medio sencillo, rápido y eficaz para obtener copias de las listas que interesan sin necesidad de utilizar las que se encuentran bajo la custodia del Superintendente y las cuales éste usa frecuentemente en el cumplimiento de sus deberes oficiales.

"Segundo: Los peticionarios tienen derecho a que se les permita inspeccionar y copiar las listas provisionales de inscripciones de votantes de 1960 para los precintos electorales de San Juan, Río Piedras II, Arecibo, Aguadilla y Yabucoa. Sin embargo, los peticionarios están en el deber de someterse a la razonable vigilancia del Superintendente General de Elecciones o sus agentes o empleados para garantizar la seguridad de dichos documentos y a cualesquiera otras medidas razonables que se les impusiere a los fines de: (1) evitar entorpecimien-

tos y dificultades que impidan el cumplimiento de los deberes que se le imponen al Superintendente y a la Junta Estatal de Elecciones; y (2) determinar el método, sitio y horas apropiadas para inspeccionar y copiar los referidos documentos con razonable prontitud.

"Por lo tanto, se ordena al Superintendente General de Elecciones que permita a los peticionarios inspeccionar y copiar las listas provisionales de inscripciones de 1960 para los precintos antes mencionados, sujeto a las condiciones y requisitos que se establecen en el Apartado Segundo de esta sentencia.

"Así lo pronunció y manda el Tribunal y firma el señor Juez Presidente, quien disintió por las razones que también expresará oportunamente."

Procede ahora explicar las razones en las cuales se funda nuestro criterio. Para ello es necesario, en primer lugar, hacer una relación detallada de los hechos pertinentes que a base de las admisiones de las partes y de la prueba ofrecida consideramos probados.

Entre los días 7 y 9 del mes de junio de 1960, los señores Mario Dávila y Eduardo Flores, en su carácter de presidente y secretario provisionales de una agrupación política conocida como Partido Acción Cristiana, se entrevistaron con el Sr. Ernesto Mieres Calimano, Superintendente General de Elecciones de Puerto Rico y le solicitaron copias certificadas de las listas provisionales de electores de 1960, correspondientes a nueve precintos electorales. Deseaban proceder a la inscripción del mencionado partido para que éste pudiera participar en las elecciones generales de 1960 y necesitaban las mencionadas listas para tener conocimiento preciso de los nombres de los electores que habían votado en las pasadas elecciones, sus circunstancias personales y el sitio exacto donde habían votado. Esos datos son indispensables para llenar las papeletas de inscripción con rapidez y exactitud.

El señor Mieres les informó a los señores Dávila y Flores que en todos los precintos existían copias de dichas listas destinadas al uso público pero que no habría inconveniente en suministrarles las que ellos interesaban. Los solicitantes

pagaron los derechos exigidos por la ley y unos días más tarde se les entregaron las copias. A partir de esa fecha y hasta los últimos días del mes de junio, los peticionarios continuaron solicitando copias de las listas de otros precintos hasta un número que según el señor Flores alcanzó a 74 y según el señor Mieres a 61. Se pagaron los derechos de ley aunque más tarde se retiraron los correspondientes a 6 precintos. Hasta el día 28 de julio, fecha de la vista ante este Tribunal, los peticionarios habían recibido de la Oficina del Superintendente 39 listas faltándoles, según el señor Flores, 29 de las solicitadas. El Superintendente había ya informado a los peticionarios que debido al enorme trabajo de su oficina le sería imposible entregarles todas las listas antes de la fecha límite—28 de agosto—fijada por la ley para someter las peticiones juradas de inscripción al Departamento de Estado.

Por tal motivo, los peticionarios se entrevistaron con el Superintendente el día 12 de julio y solicitaron se les permitiera inspeccionar y fotocopiar las listas que ellos necesitaban. Existen algunas discrepancias en cuanto a los detalles de esa entrevista pero sí es claro que la petición fue denegada por el señor Mieres, por razón del entorpecimiento en las labores de su oficina que tal acción aparejaría y por no tener, a su juicio, autoridad legal para permitirla. No obstante, les sugirió a los peticionarios que plantearan el asunto ante la Junta Estatal de Elecciones. Aceptada esa sugestión y discutida la solicitud, la Junta por unanimidad la denegó.

El señor Mieres explicó en su testimonio ante este Tribunal que desde el mes de noviembre de 1959 su oficina había enviado dos copias de las listas provisionales de 1960 a los presidentes de las juntas locales de cada uno de los 80 precintos de la isla y que una de esas listas es para uso del público y la otra para ser guardada en los archivos. Indicó, además, que luego de comenzadas las actividades de inscripción del Partido Acción Cristiana había recibido cinco

comunicaciones telegráficas de los presidentes de otras tantas juntas locales informándole que las citadas listas se habían extraviado. Identificó tales precintos como Aguadilla, Arecibo, Río Piedras II, San Juan y Yabucoa y aclaró que tan pronto se recibieron esas comunicaciones había ordenado se procediera a sacar copias de las listas de esos precintos. Dichas copias aún no les habían sido entregadas a los peticionarios.

El señor Flores, aunque en una ocasión durante su testimonio dijo que en "muchísimas cortes" ([3]) no existían las listas, luego aceptó que solamente en los mencionados precintos se le había notificado por los presidentes de las juntas locales o por miembros de su partido que las listas se habían extraviado. Añadió el precinto de Guaynabo pero aclaró luego que ya se le había informado por la Oficina del Superintendente que la lista de ese precinto estaba disponible. También en algunas ocasiones mencionó a Bayamón, pero al final informó que se le habían entregado las listas de 1956 de ese precinto.

Declaró también el señor Flores que el partido se estaba inscribiendo en más de 70 precintos y que se estaban usando "listas viejas o las del 60".

El señor Mieres explicó, también, que desde el mes de mayo de 1960 su oficina se encuentra preparando las listas finales de electores para las elecciones generales de 1960 y que la ley le impone el deber de someter esas listas a la Junta en o antes del 1 de septiembre. En su oficina existe solamente una copia de las listas provisionales de 1960, la cual es necesario usar continuamente en la preparación de las listas finales. También en su carácter de Director del Instituto de Primarias tiene acceso a otra copia de las listas provisionales. Esa copia se utiliza para las labores del Ins-

---

([3]) Las listas se guardan generalmente en las cortes debido a que los jueces de paz y de distrito son los presidentes de las juntas locales de elecciones.

tituto ([4]) y, además, se le facilita al Departamento de Estado para cotejar las papeletas de inscripción.

El procedimiento para preparar las copias certificadas de las listas pedidas por los peticionarios es lento y requiere mucho cuidado. Como no existe equipo adecuado de fotocopiar en la Oficina del Superintendente, es necesario (1) reunir las tarjetas de los electores correspondientes a cada precinto, (2) "tirar" la lista en una máquina electrónica utilizando las tarjetas, (3) cotejar la copia con la lista original para cerciorarse de que está correcta, (4) coser la copia y (5) certificarla y adherirle los sellos de rentas internas que la ley exige. El Superintendente sólo dispone de dos máquinas electrónicas que también utiliza continuamente para preparar las listas finales. No tiene empleados dedicados especialmente a la labor de preparar las copias sino que tiene que hacer asignaciones especiales a esos fines. Su personal, aunque numeroso, está constantemente atareado en la enorme y delicada labor de preparar todo lo concerniente a las elecciones generales próximas a celebrarse. Cuenta con un espacio que no es adecuado para sus necesidades y un gran número de empleados tiene que trabajar en los pasillos de una sección del Capitolio estatal, la cual ha sido debidamente aislada para evitar intervenciones extrañas.([5])

---

([4]) El art. 74 de la Ley Núm. 62 de 19 de junio de 1956 (16 L.P.R.A. sec. 1165) dispone que "las primarias se celebrarán no más tarde del último domingo del mes de julio del año en que se celebren elecciones generales." Por lo tanto y de acuerdo con la declaración del señor Mieres, a partir del 31 de julio el Instituto no tenía gran necesidad de usar la copia de las listas provisionales de 1960 que poseía.

([5]) El señor Flores declaró que en una ocasión había informado al Superintendente su disposición de aceptar copias de las listas finales de electores de 1956 en lugar de las provisionales de 1960, pero que luego de esa conversación solamente se le habían entregado las listas de dos precintos. El señor Mieres aclaró que el procedimiento para sacar copias de las listas de 1956 requiere también tiempo y cuidado. Es necesario abrir los sobres de cada colegio del precinto, constatar si hay en ellos copias de las listas sin anotaciones y si no las hay, lo cual sucede en la gran mayoría de los casos, hay que entonces utilizar el mismo procedimiento que él explicó en cuanto a las listas provisionales. Ambas

Declaró, además, el señor Mieres que luego de consultar sus archivos podía afirmar que nunca partido alguno se había inscrito en Puerto Rico utilizando la compra de listas en la Oficina del Superintendente, sino que todos lo habían hecho copiando los datos pertinentes de las listas que estaban en poder de los presidentes de las juntas locales.

Debemos concluir a la luz de la prueba recibida que: primero, desde que comenzaron las actividades de inscripción del Partido Acción Cristiana en los primeros días del mes de junio de este año, los peticionarios han tenido a su disposición y continúan teniendo, y en varias ocasiones han utilizado, para inspeccionar y copiar, las listas provisionales de electores de 1960 en las oficinas de las juntas locales de elecciones de todos los precintos electorales del país con excepción de los de Aguadilla, Arecibo, Río Piedras II, San Juan y Yabucoa; segundo, en los mencionados precintos no existen esas listas, por haberse extraviado las mismas; tercero, a la fecha de la vista de este caso el Superintendente no había podido entregarle a los peticionarios las copias de las listas de los mencionados precintos, aunque había ya ordenado su preparación; cuarto, el Superintendente General de Elecciones tiene bajo su custodia dos copias de dichas listas, las cuales utiliza frecuentemente en el cumplimiento de sus deberes oficiales como Superintendente y como Director del Instituto de Primarias; quinto, desde el mes de mayo de este año el personal de la Oficina del Superintendente se encuentra completamente atareado en la preparación de todo lo necesario para la celebración de las elecciones generales de 1960, incluyendo las listas finales de electores, las cuales deben someterse a la Junta Estatal de Elecciones en

partes estuvieron de acuerdo en que las listas de 1956, aunque de alguna utilidad, no eran sustitutos adecuados de las provisionales de 1960 porque alrededor de un 25 por ciento de los nombres en ellas incluidos eran de personas que no habían votado y que, por consiguiente, no tenían derecho a jurar peticiones de inscripción de un partido, a menos que se hubiesen inscrito de nuevo como electores.

o antes del 1 de septiembre próximo; sexto, el Superintendente ha cumplido responsable y diligentemente con su obligación de suministrar copias certificadas de las listas solicitadas por los peticionarios y en escasamente siete semanas les ha entregado las correspondientes a 39 precintos; séptimo, dichas copias no han podido prepararse con mayor celeridad debido únicamente a la escasez de equipo y personal y al enorme trabajo que tiene a su cargo la Oficina del Superintendente; octavo, mediante el uso del sistema de certificación, el Superintendente no puede entregar a los peticionarios todas las listas que estos interesan antes del día 28 de agosto de 1960, fecha en que vence el término para someter las peticiones de inscripción; noveno, desde el día 12 de julio de este año y advertidos de la descrita situación, los peticionarios solicitaron del Superintendente se les permitiera inspeccionar y fotocopiar las listas correspondientes a 29 precintos; décimo, el Superintendente se negó a lo solicitado por creer que no tiene autoridad legal para ello y por temor a que se entorpecieran las labores de su oficina; y undécimo, las listas provisionales de 1960 son muy necesarias para realizar una inscripción rápida y exacta de cualquier partido político nuevo que interese participar en las próximas elecciones generales.

Expondremos inicialmente varias consideraciones esenciales que aun cuando no están sujetas a debate en este caso, es indispensable expresarlas para ubicar debidamente la verdadera controversia. Primera: el mandamus es el recurso apropiado en este pleito por no disponer los peticionarios de otro remedio legal adecuado y por tratarse del incumplimiento de un deber que se alega ha sido impuesto por la ley. *Prensa Insular de Puerto Rico* v. *Cordero, Auditor*, 67 D.P.R. 89 (1947); *Espina* v. *Calderón, Juez*, 75 D.P.R. 76, 84 (1953); *Enforceability by mandamus of right to inspect public records*, 169 A.L.R. 653 (1947). Segunda: Se ha invocado correctamente la jurisdicción original de este

Tribunal ya que la solicitud va dirigida contra uno de los principales funcionarios del gobierno, se levantan cuestiones de gran interés público y el problema planteado requiere una resolución pronta y definitiva. *Partido Popular* v. *Gallardo*, 56 D.P.R. 706, 711 (1940). Tercera: Los peticionarios han alegado y probado que hicieron un requerimiento previo al Superintendente para que éste realizase el acto que ellos solicitan se le ordene realizar. *Suárez* v. *Corte*, 65 D.P.R. 850, 857–858 (1946); *Espina* v. *Calderón, Juez*, supra, pág. 81. Cuarta: Los peticionarios tienen indudablemente un "interés especial, distinto del interés general que pueda tener cualquier ciudadano en el derecho que reclama[n]". *Prensa Insular de Puerto Rico* v. *Cordero, Auditor*, supra, pág. 101. Su interés de inspeccionar y copiar las listas provisionales de electores de 1960 no es producto de la mera curiosidad o del deseo de entorpecer las labores de un organismo oficial, sino que nace de sus responsabilidades como organizadores y directores de un partido político en proceso de inscripción y se asienta, por consiguiente, en el derecho fundamental a la selección de candidatos y a la organización electoral protegido plenamente por la Constitución y las leyes del país y que constituye una de las garantías básicas de la democracia política.

Una vez establecidas esas premisas, pasamos a analizar las dos cuestiones que se plantean en este recurso. Son las siguientes: ¿Tiene el Superintendente General de Elecciones el deber de permitir a los peticionarios inspeccionar y copiar las listas provisionales de electores de 1960 de las cuales él es custodio? De ser así, ¿cuál debe ser el alcance y contenido de nuestra orden? La contestación a la primera depende de la interpretación de las disposiciones de ley aplicables y la de la segunda de las circunstancias específicas que deben mover nuestra informada discreción.

I

 La sec. 27 de la Ley Electoral vigente (Ley núm. 87 de 20 de junio de 1955, *Leyes*, pág. 349; 16 L.P.R.A. sec. 75) provee en su párrafo inicial que "Con arreglo a lo más adelante dispuesto, el Superintendente General de Elecciones hará preparar las siguientes listas: (*a*) Listas provisionales de inscripciones, (*b*) listas de los electores inscritos en el año de las elecciones y (*c*) listas de transferencias de inscripciones." Luego los apartados (*a*), (*b*) y (*c*) describen detalladamente el contenido de cada una de esas listas([6]) y las maneras que debe utilizar el Superintendente para prepararlas. Añade inmediatamente:

"De todas las listas referidas en esta sección bajo las letras (*b*) y (*c*), el Superintendente General de Elecciones enviará por correo certificado o por mensajero especial dos copias al presidente de la junta local de elecciones del precinto electoral a que respectivamente correspondan; una copia al presidente de cada partido; una copia a la representación de cada partido en la Junta Estatal de Elecciones y una copia al presidente del comité local de cada uno de los partidos principales y por petición en dicho precinto, y una copia adicional será retenida en el archivo de la Junta Estatal de Elecciones. Inmediatamente que reciba sus dos copias, el presidente de cada junta local de elecciones fijará al público, en sitio visible, accesible y protegido, una copia en la entrada a las oficinas de la junta local de elecciones y conservará la otra copia en los archivos de dicha junta.

"El Superintendente General de Elecciones deberá enviar las 'listas de electores inscritos en el año de las elecciones', en o antes del día 15 de abril del año en que se celebren elecciones; y debe enviar las dos 'listas de transferencias de inscripciones' en o antes del 15 de diciembre del año anterior al año en que se celebren elecciones.

"El Superintendente General de Elecciones podrá expedir copias certificadas de dichas listas previo pago de un centavo

---

([6]) Las "listas provisionales de inscripciones" para las elecciones generales posteriores a 1956, serán las listas de los electores que votaron en las elecciones inmediatamente precedentes".

por cada nombre en sellos de rentas internas que adherirá a dichas listas, cancelándolos.

"Toda persona que voluntaria y maliciosamente arrancare o dañare cualquiera de dichas listas electorales que se fijen al público incurrirá en delito grave y convicta que fuere será castigada con pena de presidio por un término no menor de seis meses.

"El Superintendente General de Elecciones preparará los impresos necesarios para las transferencias de inscripciones expresadas en el apartado (c) precedente y los venderá al precio que fije la Junta Estatal de Elecciones.

"Tanto las listas referidas en esta sección como todas las demás listas provistas en este subtítulo así como las tarjetas de notificación a los electores podrán ser preparadas por medios mecánicos mediante el uso de las máquinas necesarias al efecto."

El párrafo final establece ciertos procedimientos que afectan exclusivamente a las solicitudes de transferencias de inscripción comprendidas en el antedicho apartado (c).

Podrá observarse de la mera lectura de esas disposiciones que la Asamblea Legislativa no dispuso expresamente en la sec. 27 un método para distribuir y darle publicidad a las "listas provisionales de inscripciones" descritas en el apartado (a) y que sí lo hizo en cuanto a las listas comprendidas en los apartados (b) y (c). Tampoco hay en el resto de las provisiones vigentes que afectan el proceso electoral disposición alguna que en el mencionado aspecto cubra las listas provisionales.

Esa, sin embargo, no fue siempre la situación. Hasta el año 1950 la sec. 27 ordenaba distribuir y darle publicidad a "todas las listas referidas" en ella, en lugar de únicamente a las listas referidas bajo las letras (b) y (c). Ley núm. 384 de 11 de mayo de 1950 (*Leyes*, págs. 883, 889). No obstante, al enmendarse la sec. 27 en el próximo año (Ley núm. 7 de 27 de septiembre de 1951, *Leyes*, págs. 115, 119) se modificó el apartado (a) para que en lugar de contener como hasta entonces una explicación general sobre lo que habría de considerarse como "listas provisionales de inscripciones", contuviese bajo ese nombre y para las elecciones

generales de 1952, una mención específica de las listas de votantes que habrían de prepararse para el referéndum sobre la Constitución de 1952, según ordenaban las leyes pertinentes. Resultaba entonces superfluo establecer métodos de distribución y publicidad para dichas listas provisionales porque la ley del referéndum así ya lo disponía. Secs. 36 y 37 de la Ley núm. 27 de 30 de agosto de 1950 (*Leyes*, págs. 99, 135–141). Por esa razón se hizo referencia exclusivamente a los apartados (*b*) y (*c*). Véase también la Ley núm. 4 de 9 de febrero de 1952 (*Leyes*, págs. 193, 195).

Sin embargo, cuando en 1955 se enmendó otra vez el apartado (*a*) de la sec. 27 para de nuevo incluir una definición general del término "listas provisionales de inscripciones" y eliminar la referencia, ya inútil, a las leyes sobre el referéndum de 1952, por una omisión que a todas luces fue involuntaria, no se enmendó el párrafo sobre distribución y publicidad para reincorporarle la alusión al apartado (*a*). Por eso resulta hoy día, como anteriormente indicamos, que no hay en la ley vigente disposición alguna que expresamente cubra estos asuntos en cuanto a las "listas provisionales de inscripciones" mientras las hay que lo hacen en cuanto a las otras dos listas descritas en la sec. 27.

Se hace indispensable este comentario para poner en claro la situación de ley. Creemos, no obstante, que la señalada omisión en modo alguno elimina o modifica el carácter de documento público que tienen las "listas provisionales de inscripciones". Tanto la sec. 27 como otras disposiciones de de las leyes electorales[7] confirman la naturaleza pública de esas listas y la urgente necesidad de que estén disponibles para ser inspeccionadas y copiadas por las personas que así lo interesen. Asimismo, el Superintendente ha procedido en la práctica como si la referencia al apartado (*a*) estuviese

---

[7] Examínense como ejemplos las secs. 4J, 71, 76 a 79, 81, 112 y 215 que proveen derechos y procedimientos para utilizar los cuales se hace necesario que los interesados tengan acceso a las listas provisionales de inscripciones.

.aún en la ley vigente y ha distribuido las copias de las listas provisionales de inscripciones de 1960 de la manera que provee la sec. 27 para las otras dos listas. Como sabemos, desde noviembre de 1959 envió dos copias de esas listas a las oficinas de las juntas locales de elecciones donde, con excepción de los cinco precintos mencionados en esta opinión, han estado disponibles para el uso de los peticionarios y del público.

Además de las citadas disposiciones de las leyes electorales, debemos considerar los arts. 409 y 410 del Código de Enjuiciamiento Civil (32 L.P.R.A. secs. 1781 y 1782) en los cuales principalmente se apoyan los peticionarios.

"Art. 409: Todo ciudadano tiene derecho a inspeccionar y sacar copia de cualquier documento público de Puerto Rico, salvo lo expresamente dispuesto en contrario por la ley.

"Art. 410: Todo funcionario público bajo cuya custodia obrare algún documento público, está en la obligación de facilitar, al requerírsele, copia certificada del mismo, mediante el pago de los derechos legales correspondientes, y dicha copia será admisible como evidencia en los mismos casos y con igual efecto, que el escrito original."

En *Prensa Insular de Puerto Rico* v. *Cordero, Auditor,* 67 D.P.R. 89 (1947),[8] opinión del Juez Asociado señor de Jesús, hicimos un amplio estudio de esos artículos. Huelga repetir lo que allí explicamos. Basta recordar las dos normas fundamentales que establecimos, en adición a la del interés especial de los peticionarios, ya explicada en esta opinión. (1) "El deber de permitir la inspección de documentos existe como un deber correlativo del derecho de inspección concedido por el art. 409 del Código de Enjuiciamiento Civil y surge implícito del deber de expedir copias certificadads de dichos documentos previo el pago de los derechos correspondientes." (2) "Para que el derecho a la inspección de documentos pueda reclamarse por mandamus, no precisa una ley que expresamente imponga deber alguno de permitir la inspec-

---

[8] Confirmado en *De J. Cordero* v. *Prensa Insular de Puerto Rico,* 169 F.2d 229 (1 Cir. 1948).

ción, como una obligación comprendida en las atribuciones de un cargo. Basta que el derecho a la inspección que se reclama exista para que *ipso facto* surja el deber impuesto implícitamente por el art. 409 del Código de Enjuiciamiento Civil de permitir tal inspección."

En la citada sentencia se enfocó el problema exclusivamente sobre el derecho de inspección porque a ese derecho se limitaba la solicitud de mandamus. Es evidente, sin embargo, y no requiere análisis alguno, que las mismas normas son aplicables al derecho de "sacar copia" que el art. 409 garantiza expresamente. Los custodios de documentos públicos en nuestro país tienen, por lo tanto, el deber de permitir a las personas interesadas inspeccionar y sacar copia de esos documentos, aunque la ley pertinente no les imponga esa obligación de modo expreso.

Aunque el demandado no niega la naturaleza pública de las listas electorales, nos dice, sin embargo, que los citados arts. 409 y 410 no tienen aplicación a la controversia de autos. Sostiene que esas son "disposiciones de carácter general que deben ceder ante las disposiciones especiales del art. 27 de la Ley Electoral" y que debemos utilizar el "conocido principio de que una ley especial sobre determinada materia debe prevalecer sobre cualquier otro precepto aplicable de carácter general."

En *Banco de Ponce* v. *Secretario de Hacienda*, 81 D.P.R. 442, 449 (1959) explicamos que "No podemos interpretar las leyes sólo mediante la aplicación mecánica de los tan manidos cánones de interpretación. Estos no son otra cosa que 'generalizaciones basadas en la experiencia' . . . . y, como tales, sujetos en su aplicación a las limitaciones que cada situación concreta provee." Véase Silving, *In the Nature of a Compact—A Note on Statutory Interpretation*, 20 Revista del Colegio de Abogados de Puerto Rico 159, 167–168 (1960).

Aunque el art. 409 es una disposición de carácter general, al redactarla se tuvo buen cuidado de establecer con absoluta claridad la circunstancia que la haría inoperante. Se garantiza el derecho del ciudadano a inspeccionar y copiar cualquier documento público "salvo lo expresamente dispuesto en contrario por la ley". Esa severa restricción se justifica plenamente porque el art. 409 es en nuestro sistema el medio legal de mayor eficacia para proteger el derecho del ciudadano a enterarse de lo que su gobierno hace. Versiones idénticas o similares diseñadas con ese objetivo existen en un gran número de los Estados de la Unión. Cross, *The People's Right to Know* (1953), especialmente las págs. 19, 34, 50–55 y 337–347; Pickerell, *Secrecy and the Access to Administrative Records*, 44 Cal.L.Rev. 305 (1956); Thayer, *Legal Control of the Press*, (1956) págs. 162–178; 16 Cal. Jur.2d 122–126. A ese laudable propósito legislativo debe unirse una meticulosa interpretación judicial que le asegure plenos efectos y que así garantice a los interesados la oportunidad de inspeccionar y copiar las expresiones públicas de la conducta oficial.[9] Para resolver que el art. 409 no es aplicable a una clase determinada de documentos públicos, no podemos menos que exigirle a la Asamblea Legislativa una orden clara y terminante. Si adoptáramos la posición opuesta tendríamos que aceptar que cada vez que el legislador provee una manera de publicidad para ciertos documentos públicos, no importa lo inadecuada que resulte en términos generales o en términos de las circunstancias particulares de un caso, esa actuación por sí sola excluye al art. 409, aunque éste, para ser inaplicable, requiere por su letra un

---

[9] "No basta con que se reconozca meramente la importante justificación política de la libertad de información. Los ciudadanos de una sociedad que se gobierna a sí misma deben poseer el derecho *legal* de examinar e investigar cómo se conducen sus asuntos, sujetos sólo a aquellas limitaciones que impone la más urgente necesidad pública. Debe elevarse ese derecho a una posición de la más alta santidad si ha de constituir un baluarte contra un liderato insensible." (Énfasis en el original.) *Access to Official Information: A Neglected Constitutional Right*, 27 Ind. L. J. 209, 212 (1952).

mandato legislativo expreso en tal sentido, y por su propósito, un interés social superior al interés básico que le compete proteger.

En numerosas ocasiones el legislador ha dictaminado explícitamente que ciertos documentos tendrán carácter confidencial, o ha mencionado específicamente a las personas que pueden inspeccionarlos y copiarlos o las ocasiones en las cuales proceden tales actos.([10]) No hay el menor indicio en la sec. 27 de la Ley Electoral—sin que tomemos en cuenta la omisión de la Ley de 1955, ya explicada—indicativo de que se tuvo el propósito de hacer inaplicable el art. 409 a las listas mencionadas en esa sección o de que el método de publicidad en ella creado habría de ser exclusivo, no importa que las circunstancias concurrentes condujeran en la realidad al

---

([10]) Véanse los siguientes ejemplos: 4 L.P.R.A. sec. 615—la información obtenida por la Junta de Libertad bajo Palabra será confidencial y no podrá ser divulgada en forma alguna excepto a ciertos funcionarios: 8 L.P.R.A. sec. 24—establece la naturaleza confidencial de los documentos, expedientes, papeles, archivos y comunicaciones de la División de Bienestar Público; 13 L.P.R.A. sec. 3055—crea un procedimiento especial para inspeccionar y copiar las planillas de la contribución sobre ingresos; 16 L.P.R.A. sec. 1047—prohibe al Director del Instituto de Primarias dar información sobre los registros de un partido a los organismos centrales o locales o a los candidatos de otros partidos o al público; 24 L.P.R.A. sec. 974 (y)—establece el carácter confidencial de los informes y demás documentos rendidos en virtud de la Ley de Narcóticos y reglas especiales para su inspección y divulgación; 29 L.P.R.A. sec. 388—crea una reglamentación especial sobre los registros y demás documentos requeridos por la "Ley de Trabajo Industrial a Domicilio"; 32 L.P.R.A. sec. 2696—provee que los documentos relacionados con una adopción, sometidos al tribunal correspondiente, así como la sentencia y las órdenes judiciales, no estarán sujetos a inspección excepto por ciertas personas; 34 L.P.R.A. sec. 2007 (f)—los expedientes de los casos de niños delincuentes no estarán sujetos a inspección por el público. Véase también en cuanto a esto último 34 L.P.R.A. Ap. R.7.2, R.11.2, R.11.3, R.13.2. Véase en cuanto a los estados, Cross, *ob.cit.*, págs. 84-94. En modo alguno debe entenderse que al citar los anteriores ejemplos estamos resolviendo que los arts. 409 y 410 no tienen aplicación alguna a esos casos. Esa determinación requerirá un análisis de cada situación legal y de los hechos concurrentes. Estamos sencillamente dando ejemplos de restricciones legales específicas sobre el derecho de inspeccionar y copiar para establecer el contraste con la sec. 27 de la Ley Electoral, en la cual no aparecen esas restricciones.

fracaso de dicho método. Por el contrario, tanto de esa sección como de otras ya citadas de las leyes electorales, se desprende una genuina preocupación legislativa de darle la mayor difusión a esas listas y de ponerlas en manos de aquellos que habrían de necesitarlas para el debido ejercicio de sus derechos políticos. En ausencia de una expresión clara y específica, no podemos atribuirle a legisladores que con tanta frecuencia han revalidado sus títulos de arquitectos de un sistema electoral limpio, imparcial y honesto, [11] la voluntad de crear un método de publicidad, único y aplicable siempre no importa sus fallas en la práctica, para unas listas que constituyen el corazón del proceso inscripcionario.

Resolvemos, por consiguiente, que el art. 409 es de aplicación a las listas provisionales de inscripciones descritas en la sec. 27 de la Ley Electoral y que el Superintendente General de Elecciones, custodio de esas listas, tiene la obligación legal de permitir a los peticionarios inspeccionarlas y copiarlas.

## II

Para que deba expedirse un auto de mandamus, sin embargo, no es suficiente que el peticionario tenga un derecho claro a lo que solicita y que el demandado tenga la obligación correspondiente de permitir el ejercicio de ese derecho. Se trata de un auto "altamente privilegiado", según expresa la ley de su creación, 32 L.P.R.A. sec. 3421, y los tribunales tienen necesariamente que medir todas las

---

[11] Véase el Informe del Comité del Gobernador para el Estudio de los Derechos Civiles en Puerto Rico (Ed. Colegio de Abogados de Puerto Rico, 1959) págs. 61–78, y especialmente la pág. 63, donde se afirma que: "Dentro de los límites del Estado Libre Asociado el funcionamiento de los procesos democráticos es muy satisfactorio en cuanto se garantiza el sufragio universal, sin discrímenes; las elecciones son pacíficas, ordenadas, honestas y libres; y es suficiente el margen de libre expresión y asociación para las campañas electorales," y se añade que las fallas que se encontraron "son relativas y resaltan por nuestro interés de ser rigurosos para que se mejore hasta donde más sea posible, la calidad de la democracia puertorriqueña."

circunstancias concurrentes, tanto al determinar si debe o no expedirse el auto como al fijar el contenido de la orden, una vez resuelta en la afirmativa la cuestión inicial. En otras palabras, el remedio no se concede *ex debito justitiæ* y tan pronto se reconoce el derecho del peticionario, sino únicamente cuando el tribunal esté convencido de que se cumplirán propósitos de utilidad social e individual. Para esos fines, es indispensable estimar qué efectos tendrá la orden en el adecuado cumplimiento de las responsabilidades del funcionario afectado por ella y hasta qué punto habrá de beneficiar al solicitante. Procede, en síntesis, establecer el más fino equilibrio posible entre los diversos intereses en conflicto. ([12])

En la situación concreta de la actual controversia, no hay duda de que la oficina del Superintendente General de Elecciones está, por lo menos desde mayo de este año, en una situación de extremo agobio causada por el enorme trabajo de preparar todo lo concerniente a las próximas elecciones generales. Existen términos inexorables de Constitución y de ley a los cuales tiene que ajustarse su labor oficial. El interés público en que esas elecciones se realicen debidamente y de acuerdo con las provisiones legales pertinentes, no puede ceder ante ningún otro y este Tribunal tiene necesariamente que abstenerse de dictar órdenes que lo pongan en peligro. Aunque existe en este pleito, como ya hemos dicho, un interés especial que fluye de uno de los derechos políticos fundamentales, es de elemental justicia establecer que ni el Superintendente ni las demás autoridades públicas tienen responsabilidad alguna por el hecho de que los peticionarios, por las razones que fueren, comenzaran la inscripción de su partido escasamente tres meses antes de la fecha límite y por ese

---

([12]) Véanse *Maisonave* v. *Domenech,* 45 D.P.R. 247, 251–252 (1933); *Ortiz* v. *Muñoz,* 19 D.P.R. 850, 856 (1913); *State* v. *Knop,* 190 So. 135, 146–148 (La. 1939).

motivo, y para cumplir con las exigencias de la ley, ($^{13}$) tuvieran que realizarla a marcha forzada.

Por otro lado, la prueba demostró concluyentemente que desde que los peticionarios iniciaron su actividad inscripcionaria, han tenido a su disposición y continúan teniendo, en todos menos cinco de los precintos electorales del país, copias de las listas provisionales de inscripciones que interesan. Han podido y pueden inspeccionarlas y sacar copias sin ninguna dificultad, sujetos únicamente a una razonable vigilancia de los custodios de las listas para proteger la seguridad y disponibilidad pública de ellas.

Por las razones ya descritas, no accederemos a la solicitud de los peticionarios para que el Superintendente les permita inspeccionar y sacar copias de las listas correspondientes a los 29 precintos de los cuales no se les han entregado copias certificadas. Esa orden no sólo sería innecesaria en cuanto a 24 de esos precintos sino que podría causar grandes dificultades en las labores eleccionarias. Limitaremos nuestra orden únicamente a los precintos de Aguadilla, Arecibo, Río Piedras II, San Juan y Yabucoa, donde a los peticionarios les ha sido imposible utilizar las listas enviadas a los presidentes de las juntas locales, por haberse extraviado las mismas. Tenemos plena confianza en que el Superintendente, de acuerdo con los términos de nuestra orden, establecerá una reglamentación adecuada que permita a los peticionarios inspeccionar y copiar las referidas listas con razonable prontitud, y a su oficina continuar sin entorpeci-

---

($^{13}$) La Ley Electoral exige que un partido por petición inscriba candidatos por petición en y para las tres cuartas partes o más de todos los precintos electorales del país y presente al Departamento de Estado peticiones firmadas por un número de peticionarios igual al 10 por ciento o más del total de votos depositados para el cargo de Gobernador en las últimas elecciones generales precedentes, 16 L.P.R.A. secs. 20 y 112. El voto total para Gobernador en las elecciones de 1956 fue de 696,574. Junta Estatal de Elecciones, *Estadísticas de las Elecciones Generales Celebradas en Puerto Rico* el 6 de noviembre de 1956 (1957).

mientos la labor relacionada con las elecciones generales. [14]
*Prensa Insular de Puerto Rico* v. *Cordero*, supra, pág. 104;
*Marsh* v. *Sanders*, 34 So. 752, 754–755 (La. 1903) ; *Higgins*
v. *Lockwood*, 64 Atl. 184, 186 (N.J. 1906) ; *Kennedy* v.
*Skeen*, 186 S.E. 926, 927 (Va. 1935) ; *State* v. *Knop*, supra,
págs. 144–145.

Opinión disidente del Juez Presidente Sr. Negrón Fernández.

## I

La sección 4 del Artículo VI de la Constitución del Estado
Libre Asociado de Puerto Rico, en su párrafo tercero, provee
que "Se dispondrá por ley todo lo concerniente al proceso
electoral y de inscripción de electores, así como lo relativo a
los partidos políticos y candidaturas." [1]

Sujeto a las demás disposiciones constitucionales que sirven de base o se relacionan con la materia, [2] el anterior
precepto supone un plan legislativo integrado para reglamentar todo lo concerniente al ejercicio del derecho electoral como
proceso esencial de la democracia.

---

[14] En una ocasión durante su testimonio ante este Tribunal, el
Superintendente expresó el criterio de que, sin entorpecer el funcionamiento de su oficina, se podría permitir hasta a tres personas hacer la
labor de fotocopiar las listas.

[1] Otras disposiciones contenidas en dicha sección 4 son:

"Las elecciones generales se celebrarán cada cuatro años en el día
del mes de noviembre que determine la Asamblea Legislativa. En dichas
elecciones serán elegidos el Gobernador, los miembros de la Asamblea
Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley.

"Será elector toda persona que haya cumplido veintiún años de edad,
y reúna los demás requisitos que se determine por ley. Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer
propiedad.

. . . . . . . .

"Todo funcionario de elección popular será elegido por voto directo
y se declarará electo aquel candidato para un cargo que obtenga un
número mayor de votos que el obtenido por cualquiera de los demás
candidatos para el mismo cargo."

[2] Art. II, Sec. 2; Art. III, Secs. 4 y 7; Art. VIII, Secs. 1 y 2;
Art. IX, Sec. 6.

Este ordenamiento jurídico está representado por las siguientes leyes: Ley Electoral, (³) Ley de Inscripciones, (⁴) Ley sobre Impugnación de una elección excepto la de Legislador o Comisionado Residente, (⁵) Ley sobre Elecciones Especiales para cubrir vacantes en la Asamblea Legislativa, (⁶) Ley de Primarias, (⁷) Ley del Fondo Electoral para los Partidos Políticos; (⁸) y por aquellas disposiciones del Código Penal relativas a delitos contra el derecho electoral, cuya publicación la propia Ley Electoral ordena se incluya como suplemento adjunto a la misma, (⁹) y del Código Político que exige a los candidatos a cargos por elección las condiciones requeridas para ser elector, (¹⁰) además de las Reglas y Reglamentos sobre materia electoral promulgadas de acuerdo con la ley.

Fue precisamente para reglamentar en forma ordenada el derecho del ciudadano a obtener copias de las listas electorales, que se incluyó en la Ley Electoral, sección 27, 16 L.P.R.A. sec. 75, la disposición de que "El Superintendente General de Elecciones podrá expedir copias certificadas de dichas listas previo el pago de un centavo por cada nombre

---

(³) Ley Núm. 79 de 25 de junio de 1919, según enmendada. 16 L.P.R.A. sec. 1 et seq.

(⁴) Ley Núm. 19 de 10 de junio de 1939, según enmendada. 16 L.P.R.A. secs. 351 et seq.

(⁵) Ley Núm. 72 de 4 de mayo de 1931, según enmendada. 16 L.P.R.A. sec. 401 et seq.

(⁶) Ley Núm. 20 de 22 de agosto de 1952, según enmendada. 16 L.P.R.A. secs. 441 et seq.

(⁷) Ley Núm. 62 de 19 de junio de 1956, según enmendada. 16 L.P.R.A. secs. 1001 et seq.

(⁸) Ley Núm. 110 de 30 de junio de 1957, según enmendada. 16 L.P.R.A. secs. 601 et seq.

(⁹) "Sec. 98.—El Superintendente General de Elecciones copiará la sanción penal establecida en diversos casos de este subtítulo, y asimismo la comprendida en el Código Penal, con relación a los casos de elecciones, para que se editen como suplemento adjunto a este subtítulo. Asimismo dará la mayor publicidad posible a dicha sanción penal, en todas las ciudades y pueblos del Estado Libre Asociado, con la anticipación necesaria, todos los años en que hubieren de celebrarse elecciones." 16 L.P.R.A. sec. 289.

(¹⁰) Art. 183, Código Político—16 L.P.R.A. sec. 521.

en sellos de rentas internas que adherirá a dichas listas, cancelándolos." (¹¹) Disposición similar se incluyó en la sección 35, 16 L.P.R.A. sec. 85, (¹²) en relación con las listas de colegio de cada precinto electoral, o sea, las listas finales de votantes para las elecciones generales, así como en la sección 3 de la Ley sobre Elecciones Especiales para cubrir vacantes en la Asamblea Legislativa, 16 L.P.R.A. sec. 443, (¹³) en relación con las listas de votantes a ser usadas en la elección especial.

La voluntad legislativa surge, a mi juicio, con patente claridad, en el sentido de que para obtener copia de las listas electorales debe atenerse el ciudadano a las disposiciones que el orden jurídico que reglamenta el proceso electoral en todas sus etapas provee, pues es legislación dirigida especialmente a ese fin, según mandato constitucional, sin que tenga sitio de aplicación en ese orden jurídico legislación de índole general con la cual no intentó el legislador reglamentar fase alguna de ese proceso. Bajo el plan legislativo así integrado no hay que exigir a la Asamblea Legislativa—la que a través de esa legislación especial está proveyendo "todo lo concer-

---

(¹¹) La omisión de reincorporar a la sección 27 de la Ley Electoral, en enmiendas subsiguientes a la del 27 de septiembre de 1951, la referencia al párrafo (a) de la misma sobre "listas provisionales de inscripciones", según correctamente se expone en la opinión del Tribunal, no altera el carácter público de dichas listas. El requisito de distribución y publicidad de las mismas que siempre formó parte del plan legislativo para el desarrollo del proceso electoral, continúa vigente por imperativo del proceso mismo y necesidad inherente del propio sistema. Así lo ha seguido entendiendo el Superintendente General de Elecciones al continuar remitiendo dichas listas, al igual y para los mismos fines que las otras expresamente mencionadas en la sección 27 de la Ley, a los funcionarios y organismos en ella dispuestos.

(¹²) " . . . *Disponiéndose*, que cualquier persona podrá obtener una copia certificada de cualquiera de dichas listas, mediante el pago de un centavo, en sellos de rentas internas, por cada nombre de elector contenido en las mismas, los cuales sellos se fijarán debidamente en dichas listas y serán cancelados por el Superintendente General de Elecciones."

(¹³) " . . . Cualquier persona podrá obtener copia de dicha lista de votantes mediante el pago de un centavo en sellos de rentas internas por cada nombre de elector contenido en las mismas los cuales sellos se cancelarán por el Superintendente General de Elecciones."

niente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas", según manda la Constitución—"una orden clara y terminante" en el sentido de que el artículo 409 ([14]) del Código de Enjuiciamiento Civil no es aplicable a las listas electorales. No se trata aquí de una omisión de la Ley Electoral por haber dejado de proveer específicamente—como lo hace el artículo 409—que los ciudadanos o electores tendrán derecho "a inspeccionar y sacar copia" de las listas electorales en poder del Superintendente. No. Se trata de una ley especial que reglamenta una materia especial y que dice cómo se obtienen copias de esas listas que tiene el Superintendente. No es que la Asamblea Legislativa quite a dichas listas el carácter de públicas, que por imperativo del proceso electoral de que forman parte, tienen, y que la propia disposición de cómo obtener copias de las mismas, ratifica. La Asamblea Legislativa lo que hizo fue expresar la política pública, en cuanto a esta clase de documentos públicos, y no consideró sabio abrir las oficinas del Superintendente o de la Junta Estatal de Elecciones a la inspección y saca de copias, por cualquier persona, de unas listas cuya publicidad y acceso público hacía patente de otro modo.

El hecho de que la Asamblea Legislativa incorporara substancialmente en el artículo 27 de la Ley Electoral, como parte del ordenamiento jurídico sobre esta materia especial, las disposiciones del artículo 410 ([15]) del Código de Enjuiciamiento Civil y no adoptara las del artículo 409 del mismo cuerpo legal, evidencia el propósito legislativo de no hacer las disposiciones de este último aplicables a las listas electo-

---

([14]) Art. 409: "Todo ciudadano tiene derecho a inspeccionar y sacar copia de cualquier documento público de Puerto Rico, salvo lo expresamente dispuesto en contrario por la ley."

([15]) Art. 410: "Todo funcionario público bajo cuya custodia obrare algún documento público, está en la obligación de facilitar, al requerírsele, copia certificada del mismo, mediante el pago de los derechos legales correspondientes, y dicha copia será admisible como evidencia en los mismos casos y con igual efecto, que el escrito original."

rales, sin dejar de ofrecer al ciudadano, no obstante, una oportunidad razonable para obtener dichas listas, a través de las disposiciones de la sección 27. No estaba la Asamblea Legislativa obligada a hacer en la Ley Electoral una expresión contraria a las disposiciones del artículo 409, ya que éste quedaba excluido de la esfera de dicha legislación por virtud inherente de la propia reglamentación establecida para todas las fases del proceso electoral.

No afecta la teoría que expreso el hecho de que en numerosas ocasiones se haya dispuesto por legislación que ciertos documentos tengan carácter confidencial, según se ilustra en el escolio 10 de la opinión del Tribunal. [16] Lo que la Asamblea Legislativa aquí hizo—y podía hacer—en el ejercicio razonable de su poder de reglamentación de todo lo concerniente al proceso electoral, fue establecer el sistema de publicación de las listas, para información de la ciudadanía, y determinar la forma en que cualquier persona podía obtener copias de las mismas del Superintendente, lo cual dista mucho de consagrar la vigencia del artículo 409 en el ámbito de esa reglamentación especial, sin que pueda invocarse el mismo ni para amparar un derecho que dicha reglamentación no intentó reconocer, ni para obligar a la Asamblea Legislativa a seguir una norma específica en su técnica de legislar, por el hecho de que una anterior Asamblea Legislativa, en el

---

[16] La disposición del artículo 18 de la Ley de Primarias, 16 L.P.R.A. 1047, en el sentido de que "El Director no dará información alguna de los hechos expresados en los Registros de determinado partido a los organismos centrales o locales o a los candidatos de otros partidos, ni al público" pero que "a solicitud del organismo central de un partido o el representante de una candidatura de ese partido podrá certificar si el nombre de una persona incluida en su candidatura aparece o ha aparecido inscrito en el Registro de otro partido", lejos de representar un índice de que la Asamblea Legislativa siguió en materia electoral la pauta sobre técnica de legislar que se infiere del artículo 409, constituye una demostración indisputable de que la reglamentación de "todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas" hay que buscarla en las leyes especiales que integran el plan legislativo sobre esa materia y no en disposiciones generales fuera del mismo.

artículo 47 de la Ley de Evidencia (que es el 409 del Código de Enjuiciamiento Civil) la única salvedad que hiciera al declarar el derecho de inspección y saca de copia de documentos públicos fue la de "lo expresamente dispuesto en contrario por la ley."

No es necesario considerar aquí si por virtud de las disposiciones de la sección 27 que reconoce el derecho a obtener copias certificadas de las listas electorales, la Asamblea Legislativa incorporó a la Ley Electoral el derecho de inspección que este Tribunal, en *Prensa Insular de Puerto Rico* v. *Cordero, Auditor*, 67 D.P.R. 89, confirmado en 169 F.2d 229, proclamó estar implícito en las disposiciones del artículo 410 del Código de Enjuiciamiento Civil.

La naturaleza de los documentos aquí envueltos—listas electorales—el contenido y publicación de las cuales establece la ley, independientemente del propósito para el cual se interesaban las mismas, irradia de aplicación a este caso el principio en que se fundó este Tribunal en el de *Prensa Insular* para sentar la teoría del derecho implícito a la inspección previa como base necesaria del conocimiento que debe tenerse del contenido de un documento para estar en condiciones de pedir copia certificada del mismo. Claramente en este caso, en el que medió una solicitud en masa de listas electorales, cualquiera que fuere el contenido de las mismas, no entra en juego el derecho a inspección, ni está envuelto el cardinal principio en que se funda el derecho del ciudadano a estar informado de las gestiones y actuaciones de su gobierno, que ya las ha hecho públicas, reconociendo por ese propio hecho la esencia misma del proceso de la democracia.

## II

El único deber ministerial del Superintendente en cuanto al derecho de los peticionarios a obtener copias de las listas electorales, que surge impuesto por necesaria implicación del plan legislativo que reglamenta todo lo concerniente al proceso electoral, era el de entregar copias certificadas de las

listas solicitadas en la forma prevista en la sección 27 de la Ley Electoral.(17)

El Superintendente nunca se negó a entregar las copias certificadas de los 68 precintos que según el peticionario Flores le había solicitado, aunque sí advirtió claramente que para el 28 de agosto no podía—por razones justificadas de falta de tiempo para reproducirlas, que quedaron incontrovertidas en la prueba—entregarles *todas* las 68 listas interesadas, de las cuales ya para el 28 de julio (en 32 días laborables desde el 9 de junio en que solicitaron las primeras 6 listas) les había entregado 39.

Ningún intento hicieron los peticionarios para demostrar —y ciertamente la prueba en el récord revela que no podían hacerlo—que el Superintendente incumpliera el deber de entregarles copias certificadas de todas las listas con anterioridad al 28 de agosto sin riesgo de afectar la celebración normal de las elecciones generales del 8 de noviembre siguiente. Y nada hay en la prueba que indique que luego de conocido por ellos el hecho de que en los precintos de Aguadilla, Arecibo, Río Piedras II, San Juan y Yabucoa no existían las listas provisionales de electores de 1960, hubieran requerido de dicho funcionario que les preparara y certificara con prioridad a todas las demás, las listas de los cinco precintos mencionados. Por el contrario, ellos interesaban las copias certificadas de *todos* los 68 precintos, a pesar de estar ya advertidos de que *no todas* las listas le podían ser entregadas antes del 28 de agosto.

---

(17) Aunque el lenguaje de la sección 27 de la Ley Electoral es al efecto de que el Superintendente "podrá" expedir copias certificadas de dichas listas, en vez de "está en la obligación" que es el que usa el artículo 410 del Código de Enjuiciamiento Civil, el término "podrá", por la naturaleza pública del derecho envuelto y por el evidente propósito del estatuto, le impone un *deber* afirmativo que cumplir al Superintendente. Los casos de *O'Connel* v. *City of Cambridge,* 154 N.E. 760, *Rich.* v. *Board of State Canvassers,* 59 N.W. 181; *Korb* v. *Fox,* 9 S.W.2d 298; *Smith* v. *Curtis,* 223 S.W.2d 712; *Whitfield* v. *Grimes,* 294 N.W. 346 ilustran el principio de interpretación estatutaria que justifica este aserto.

El propósito al solicitar las listas de los 68 precintos que fue expresado por el peticionario Flores en términos de *necesidad* de obtener los datos exactos en cuanto a nombre, edad, color, año y barrio en que se inscribió el elector que iba a firmar la petición de inscripción (pág. 10 Rec. Taq.) revierte a términos de *comodidad* cuando al explicar que habiendo recibido las listas de 39 precintos, aún faltaban las de 29, se expresó así:

"En los treinta y nueve tenemos las listas. Ahora, hay un problema, el problema es que es un proceso muy lento. Porque la gente tiene que ir a la corte, buscar allí incómodamente ese nombre, no hay sitio en la corte cómodo para pasar eso, no hay maquinilla y las listas las necesitamos en nuestra oficina porque entonces cómodamente vamos llenando la información correctamente bajo condiciones eficientes y no corremos el riesgo de copiar mal en las condiciones que hay en las cortes." (Pág. 29, Rec. Taq.)

No hay que olvidar las siguientes palabras del Superintendente al testificar ante este Tribunal:

". . . de la búsqueda que he hecho no hay ningún partido político en Puerto Rico, que se haya inscripto comprando listas. Todos los partidos políticos en Puerto Rico se han inscrito a través de los pres . . . , de las Juntas Estatales copiando de las listas que nosotros suministramos. Este es el único partido que ha solicitado compra de listas." (Pág. 14, Rec. Taq.)

Si consideramos que la primera solicitud al Superintendente para adquirir copias certificadas de las listas interesadas por los peticionarios (las de 68 precintos, según declaró el Sr. Flores) se hizo el 9 de junio de 1960 (o sea, unos 53 días laborables antes del término final establecido por ley para presentar en la Secretaría de Estado las peticiones para la inscripción de un partido político), podemos apreciar que la inusitada solicitud de los peticionarios impuso al Superintendente, por la limitación de tiempo envuelta, una presión

de labor fuera de lo normal que nunca antes había afrontado un Superintendente General de Elecciones en la administración de la Ley Electoral.

La historia sobre el desarrollo inscripcionario de los partidos por petición en Puerto Rico, según lo arriba transcrito, justifica plenamente, y no hace irrazonable ni arbitraria, la política pública establecida por la Asamblea Legislativa en lo relativo a la forma y manera de obtener el ciudadano copia de las listas electorales, o sea, a través de la sección 27 de la Ley Electoral y no del artículo 409 del Código de Enjuiciamiento Civil.

El Tribunal declaró con lugar la petición de mandamus en cuanto a cinco de los veintinueve precintos cuyas listas certificadas a la fecha de la vista del recurso aún no había entregado el Superintendente, y la denegó en cuanto al resto de dichos precintos, fundándose en que, con relación a estos últimos, los peticionarios tenían a su alcance en las Juntas Locales de Elecciones, las listas interesadas donde podían inspeccionarlas y sacar copias de ellas, mientras que en cuanto a los primeros cinco no existían dichas listas en poder de las Juntas Locales y por lo tanto los peticionarios no tenían acceso a ellas en los respectivos precintos. Debo inferir que si en las Juntas Locales de todos los 29 precintos hubieran estado disponibles las referidas listas, el Tribunal hubiera denegado la petición de mandamus en su totalidad.

Si esta apreciación es correcta, mi teoría de que no procedía el mandamus en este caso ni aún en cuanto a los cinco precintos de referencia—por no tener el Superintendente deber ministerial alguno que cumplir respecto al derecho invocado por los peticionarios, que no fuera otro que el de expedirle copias certificadas de dichas listas según había venido haciendo—se robustece por la propia determinación del Tribunal. Si los peticionarios tenían derecho a inspeccionar y fotocopiar las listas en poder del Superintendente

correspondientes a los cinco precintos aludidos, igual derecho tenían de inspeccionar y fotocopiar las listas de todos los veintinueve precintos, sujeto el ejercicio de ese derecho a las mismas limitaciones que le fueron impuestas por el Tribunal respecto a la inspección y copia de las listas de cinco de ellos, ya que la posibilidad de llevar a cabo la labor en cuanto a los veintinueve precintos dentro de las limitaciones y condiciones impuestas en su sentencia por el Tribunal para llevarla a cabo en cuanto a cinco, era una cuestión de hecho que dependía de la forma y manera en que se realizara dicha labor bajo la reglamentación razonable que el Superintendente adoptara a esos fines. En esas condiciones, el derecho reconocido a los peticionarios parece hacerse depender de la circunstancia fortuita de no estar en poder de las Juntas Locales de cinco precintos de la isla las listas correspondientes a los mismos. A mi juicio, dentro de la esfera de aplicación del artículo 409 del Código de Enjuiciamiento Civil, tal limitación opera como una restricción injustificada del derecho que el mismo consagra.

De otro lado, la prueba incontrovertida en el récord es al efecto de que tan pronto fue notificado el Superintendente por los presidentes de las Juntas Locales de esos cinco precintos de que las listas correspondientes no estaban en dichas Juntas, ordenó que se hicieran las mismas para que todos los precintos las tuvieran, si bien a la fecha de la vista aún no se habían enviado. Los peticionarios no demostraron que estas cinco listas no hubiesen podido estar en poder de las respectivas Juntas dentro de un tiempo razonable para que los peticionarios pudieran hacer uso de ellas en las propias Juntas Locales en igual forma que las de los demás precintos interesados.

Por los motivos expuestos consideré improcedente la expedición del mandamus solicitado y anoté mi disenso, que ahora explico.